UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NANCY NORTON, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Civil Action No. 21-0724 (CKK) |

MEMORANDUM OPINION
(March 11, 2022)

Plaintiff Nancy Norton brings this action against Defendant United States of America under the Federal Tort Claims Act ("FTCA"), alleging that she suffered injuries when she tripped and fell on the South Lawn of the White House during the 2019 White House Easter Egg Roll. Pending before the Court is Defendant's [8] Motion to Dismiss. Defendant argues that this Court lacks jurisdiction over Plaintiff's claim because her exclusive remedy is through the Federal Employees' Compensation Act ("FECA"), and not the FTCA. Because FECA does not apply to Plaintiff, and upon consideration of the briefing,[1] the relevant legal authorities, and the entire record, the Court shall **DENY** Defendant's Motion.

I. BACKGROUND

Plaintiff's claim arises from an injury she allegedly sustained on April 22, 2019 while working at the White House Easter Egg Roll ("Easter Egg Roll"), held on White House grounds

---

[1] The Court's consideration has focused on:
- Defendant's Motion to Dismiss, ECF No. 8 ("Motion" or "Mot.");
- Plaintiff's Opposition to Defendant's Motion to Dismiss, ECF No. 9 ("Opp.");
- Defendant's Reply in Support of Motion to Dismiss, ECF No. 10 ("Repl."); and
- Plaintiff's Complaint for Negligence, ECF No. 1 ("Compl.").

In an exercise of its discretion, the Court declines to hold oral argument in this case.

1

in the President's Park. *See* Compl. ¶¶ 12, 18–26. The Easter Egg Roll is an annual event hosted by the United States Department of the Interior, National Park Service ("NPS"), the White House, and the White House Historical Association (collectively, the "Parties"). In February 2018, the Parties entered into an agreement regarding sponsorship of the Easter Egg Roll for 2018, 2019, and 2020 (the "Agreement"). Mot. at 3–4; Declaration of Heather Martin, ECF No. 8-4, Ex. A ("Agreement"). The Agreement specified that "[a]ll unpaid representatives of the Parties shall be Volunteers in the Parks, under 54 U.S.C. § 102301." Agreement ¶ IV(M). According to Plaintiff, she never saw, signed, or knew of the Agreement, nor did she fill out or sign any federal employment application or contract. Opp. at 2, 10; Affidavit of Nancy Norton ("Norton Affidavit"), ECF No. 9-1, ¶ 11–12.

Plaintiff alleges that she first learned of the opportunity to work at the Easter Egg Roll from her friend, Julie Cooper, who worked for Full Moon Marketing & Events ("Full Moon"). Norton Affidavit ¶ 1; Opp. at 1–2. According to Plaintiff, Full Moon had been hired by the Coca-Cola Company ("Coca Cola") to help staff the Easter Egg Roll, and Plaintiff was told that she would be working on behalf of Coca Cola. Norton Affidavit ¶ 1–2; Compl. ¶ 16; Opp. at 1–2. Coca Cola worked with Full Moon to secure necessary arrangements such as booking Plaintiff a hotel room. Norton Affidavit ¶ 4. In addition, Coca Cola established rules regarding Plaintiff's dress code, physical appearance, work hours, and a prohibition on bringing non-Coca Cola products to the Easter Egg Roll. *Id.* Plaintiff received compensation for her time at the Easter Egg Roll from Rosedale Marketing LLC, a private company, in the amount of $202.50 ("Rosedale"). Compl. ¶ 17; Opp. at 3.

While on White House grounds, Plaintiff alleges that, during a break from her work for Rosedale, she sustained severe injuries when she tripped and fell on an unsecured cord on an

asphalt walkway on the South Lawn. Compl. ¶¶ 21–26. As a result of the injuries she sustained, Plaintiff received surgery in her elbow. Compl. ¶ 28. Plaintiff argues that Defendant negligently maintained the White House grounds and walkways in an unsafe condition during the event, and that Defendant knew or, in the exercise of reasonable care, should have known that the asphalt walkway was "extremely dangerous and posed a risk of severe injury to event attendees." *Id.* ¶¶ 30, 34. Plaintiff further claims that Defendant, as the host of the Easter Egg Roll, breached its duty of care owed to her by failing to place warning signs on the walkway or "correct the dangerous condition by the unsecured cord." *Id.* ¶¶ 33, 35.

The Court previously dismissed this case without prejudice due to Plaintiff's failure to exhaust her administrative remedies. *See Norton v. United States*, 530 F. Supp. 3d 1, 8 (D.D.C. 2021). At that time, the Court did not consider, nor did Defendant raise, Defendant's current argument that the Court lacks jurisdiction to hear Plaintiff's FTCA claim because Plaintiff's sole remedy is through compensation pursuant to FECA. *See id.* Shortly after the initial complaint was dismissed, Plaintiff refiled her complaint. The Court must now address whether jurisdiction is proper in the case.

## II.  LEGAL STANDARD

Defendant moves to dismiss Plaintiff's claim for lack of subject matter jurisdiction. A court must dismiss a case pursuant to Federal Rule of Civil Procedure 12(b)(1) when it lacks subject matter jurisdiction. In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citation omitted); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)

3

("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").

In reviewing a motion to dismiss pursuant to Rule 12(b)(1), courts must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005) ("At the motion to dismiss stage, counseled complaints as well as pro se complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact."); *Koutny v. Martin*, 530 F. Supp. 2d 84, 87 (D.D.C. 2007) ("[A] court accepts as true all of the factual allegations contained in the complaint and may also consider undisputed facts evidenced in the record." (internal citations and quotation marks omitted).

Despite the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted). A court need not accept as true "a legal conclusion couched as a factual allegation" or an inference "unsupported by the facts set out in the complaint." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal citation and quotation marks omitted).

### III.     DISCUSSION

The Federal Tort Claims Act provides for a limited waiver of sovereign immunity in suits against the United States for tortious actions committed by federal employees acting in the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  However, when federal employees are injured during the course of their job, Congress has provided an alternative and exclusive remedy for such work-related injuries—compensation pursuant to FECA.  Specifically, FECA states that:

> The liability of the United States . . . with respect to the injury or death of an employee is *exclusive* and *instead of* all other liability of the United States . . . to the employee . . . because of the injury or death in a direct judicial proceeding, in a civil action . . . or judicial proceeding . . . under a *Federal tort liability statute*.

5 U.S.C. § 8116(c).

The parties disagree over whether Plaintiff, at the time of her alleged injury, was a federal employee for purposes of FECA.  If so, then Plaintiff's exclusive remedy is to file a claim for compensation pursuant to FECA, stripping the Court of jurisdiction.   If not, then Plaintiff's exclusive remedy is the FTCA, and this Court must deny Defendant's motion to dismiss.

Defendant argues that Plaintiff falls under the statutory definition of "employee" for purposes of FECA.  *See* Mot. at 5–11.  FECA defines "employee" in relevant part as: "an individual rendering personal service to the United States similar to the service of a civil officer or employee of the United States, without pay or for nominal pay, when a statute authorizes the acceptance or use of the service . . . ." 5 U.S.C. § 8101(1)(B).  The parties agree that the only statute relevant here authorizing "the acceptance or use" of such uncompensated service is the Volunteers in the Parks Act, 54 U.S.C. § 102301.  Specifically, that statute provides that "volunteers under this chapter shall be deemed civil employees of the United States within the meaning of the term

5

'employee' as defined in [FECA]." *Id.* § 102301(c)(3).

Accordingly, the parties disagree about whether the Plaintiff meets the statutory definition of "volunteer" in 54 U.S.C. § 102301. Because neither the statute's plain meaning, the legislative history, nor the Defendant's own prior history of interpretation of the statute support Defendant's current reading, the Court concludes that Plaintiff has met her burden at this stage in establishing that this Court has jurisdiction.

### A. The Agreement Has No Effect on Whether Plaintiff is an "Employee"

Defendant principally argues that the Agreement specifies that any uncompensated individual working at the Easter Egg Roll, such as Plaintiff, shall be deemed a "volunteer" under § 102301. *See* Mot. at 5–6. Setting aside the issue of whether Plaintiff ever saw, signed, or even knew of the Agreement, the Court finds the Agreement and the provisions therein regarding the status of certain workers as "volunteers" to be, at present, irrelevant. The question of whether Plaintiff meets the statutory definition of "volunteer" under § 102301 is not affected by contractual understandings. Federal statutes may not be amended or nullified by agency contract. *Cf. Am Lung Ass'n v. EPA*, 985 F.3d 914, 951 (D.C. Cir. 2021) (in the context of changes in agency position, "statutory text changes only when it is amended"). Indeed, Defendant seems to acknowledge the problems with this argument, conceding that "Defendant does not rely on the Agreement as a source of law . . . [as] [t]he Act deprives this Court of jurisdiction *irrespective* of whether the Agreement was in place . . . ." Mot. at 2 n.1 (emphasis added).

### B. Statutory Text

Accordingly, this Court must construe what it means to be a "volunteer" within the meaning of the Volunteers in the Park Act, 54 U.S.C. § 102301. As always, the Court must begin with the language of the statute. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447

6

U.S. 102, 108 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself.").

> The Secretary [of the Interior] may recruit, train, and accept . . . the services of individuals without compensation as volunteers for or in aid of interpretive functions or other visitor services or activities in and related to System units and related areas.

54 U.S.C. § 102301(a). Defendant's proffered construction of the statute would have this Court stretch, in Procrustean manner, the meaning of words beyond what they are capable of bearing.[2] *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 476–77 (2003) ("[a]bsent a statutory text or structure that requires us to depart from normal rules of construction, we should not construe the statute in a manner that is strained").

1. "[R]ecruit, train, and accept"

The Act first specifies that volunteers must be "recruit[ed], train[ed], and accept[ed]" by the Secretary of the Interior. At a minimum, the phrase "recruit, train, and accept" suggests that the National Park Service have some sort of interaction or connection with the persons allegedly volunteering their services to NPS. The word "accept" implies that an individual has first voluntarily offered their services to the NPS. Certainly, the NPS may not conscript an individual into serving as a volunteer in the national parks. Indeed, as part of the Volunteers-in-Parks program, NPS normally requires prospective volunteers to fill out and sign a "Volunteer Service Agreement." *See* National Park Service, Director's Order #7: Volunteers-in-Parks, § 4 (Mar. 15,

---

[2] Much of Defendant's briefing argues that third parties cannot contract around the sovereign immunity of the federal government. But this argument is beside the point as it fails to address the antecedent question of whether Plaintiff is properly classified as a volunteer under the Act in the first place. Defendant is assuredly correct that an individual otherwise meeting the statutory definition of a volunteer in the park cannot defeat such a status by accepting compensation from a third party. For example, an NPS volunteer who assists with the historical reenactment of a Civil War battle does not lose volunteer status because he accepts grant money from a private party. This is not such a case.


2016) *available at* https://www.nps.gov/policy/DOrders/DO_7_2016.html. There is no evidence here that Plaintiff ever believed that she was offering services to the NPS or that she signed a "Volunteer Service Agreement." Rather, as Defendant does not dispute, Plaintiff believed that she was providing services for a private concessions contractor. It would be a curious construction of the statute to hold that the Secretary may accept the services of a person who is unaware that they are offering their services for no compensation to the National Park Service.

The Court need not, however, delve into the precise meaning of this phrase as nothing in the record suggests that the Secretary or his agents "recruit[ed], train[ed], and accept[ed]" the services of Plaintiff. Indeed, at no point in their briefing before this Court does Defendant address the phrase "recruit, train, and accept" and its implications regarding Plaintiff's employment status. That will not do. A court may not presume that Congress intended for whole words and phrases of a statute to be effectively meaningless or mere surplusage. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 (1993) ("We will not read the statute to render the modifier superfluous"); *Dole Food Co.*, 538 U.S. at 476–77 ("[W]e should not construe the statute in a manner that . . . would render a statutory term superfluous."). Rather, every word of a statute is to be given effect. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992) (declining to construe a statute in a manner that would violate the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect"). Accordingly, unless Plaintiff was "recruit[ed], train[ed], and accept[ed]" by the Secretary, she falls outside the definition of volunteer.

Although the exact details are unclear, the record suggests that Plaintiff was first approached for the position by a friend unaffiliated with either the Secretary or the federal government. That friend was contacted by a marketing and events company associated with Coca

Cola which itself had contracted with the White House Historical Association ("WHHA") to provide event management services for the White House Easter Egg Roll. The National Park Service was involved only insofar as NPS was a party to the Agreement entered into with the WHHA and the Easter Egg Roll took place on federal grounds within the jurisdiction of the NPS. Nothing in the record demonstrates that the Secretary or NPS ever interacted with, let alone "recruit[ed], train[ed], and accept[ed]" Plaintiff. Although discovery may change these facts, as pled, they do not show that NPS "recruit[ed], train[ed], [or] accept[ed]" Plaintiff.

      2. Services "in aid of interpretive functions or other visitor services or activities"

The Act next provides that individuals serving as volunteers will render services "in aid of interpretive functions or other visitor services or activities in and related to System units and related areas." Once again, Defendant provides no argument as to how Plaintiff fits within the statutory language, nor does Defendant quote or cite this language of the Act. Regardless, the Court must independently construe the language in a natural manner without stretching the meaning of words or phrases. The phrase here can be further broken down into two separate, albeit related, parts: "interpretive functions" and "other visitor services or activities."

"Interpretive functions" means the provision of "opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the [National Park] System." 54 U.S.C. § 100801(1)(A). The Secretary is encouraged to coordinate with volunteers "in the delivery of quality [interpretive] programs and services to supplement those provided by the Service." *Id.* § 100804(1). Interpretive functions are thus clearly understood to be public-facing, educational, and designed to assist visitors to National Parks in learning more about the Park. Second, the phrase "other visitor services or activities" suggests a linguistic relationship to the term "interpretive functions." By using the word "other,"

9

Congress likely intended that the types of "visitor services or activities" referred to in the statute be of a similar type or kind to the interpretive functions, as defined above. *See Amgen, Inc. v. Smith*, 357 F.3d 103, 112-13 (D.C. Cir. 2004) ("The canon of statutory construction[] *noscitur a sociis*, i.e., a word is known by the company it keeps . . . is 'often wisely applied where a word is capable of many meanings in order to avoid giving unintended breadth to the Acts of Congress." (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). Otherwise, Congress would have simply left out the word "other" if it intended for "visitor services or activities" to be given a broader meaning.

Although Plaintiff's exact role during the Easter Egg Roll is unclear, what is clear at this stage of the case is that she performed no functions that may be deemed educational or designed to help Easter Egg Roll attendees "form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the [National Park] System." As such, the facts as pled do not permit a finding that Plaintiff "volunteered" within the plain meaning of the relevant statutory language.

C.  **Legislative History**

Even if there were some ambiguity, the legislative history of forecloses any other reading. The Senate Report provides that "[t]he volunteer which this legislation comprehends is a private citizen who accepts an appointment, subject to prescribed requirements, to perform a specific function for a limited period of time without compensation." S. Rep. 91-1013 at 3580. Specifically, "each volunteer will be recruited on an individual basis and will be assigned to functions which complement and supplement the work of regular and seasonal park personnel . . . [such as] help[ing] to provide special information, services to visitors, assist[ing] in archeological digs, conduct[ing] special research, or help[ing] in the interpretation of historical events." *Id.* This

10

legislative history indicates the type of volunteer Congress had in mind when drafting the Act and strongly casts doubt on defendant's argument that Plaintiff—compensated for her time working at the behest of Coca Cola and neither "recruited" by the Secretary nor "assigned to functions which complement and supplement the work of regular and seasonal park personnel"—qualifies as a "volunteer" within the meaning of the Act.

But legislative history alone is not dispositive as to the meaning of a statute as it "is not the law." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (quoting *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612, 1631 (2018)).  As the Supreme Court has "repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).  Nor can Congress' alleged purpose in passing a statute foreclose additional readings supported by the plain meaning of the statutory text. *See id.* ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.").  Even if Congress did not have individuals like Plaintiff in mind when drafting the Act (which certainly seems to be the case), a statute should not be read in such a restrictive manner. *See Union Bank v. Wolas*, 502 U.S. 151, 158 (1991) ("The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning.").

Bolstering the conclusion that Plaintiff is not a volunteer within the meaning of the Act is NPS's own definition of what it considers a volunteer in the park to be. *See* NPS Reference Manual 7, Ch. 2 *available at* https://www.nps.gov/subjects/volunteer/rm7-ch2.htm ("NPS Manual"). While not binding upon the Court, the interpretation of volunteer in the Act proffered by defendant is at odds with how NPS has itself defined and considered volunteer status under the Act.  For one,

the NPS Reference Manual, cited by Defendants, explains that NPS volunteers must wear distinctive "VIP" uniforms replete with specified "volunteer insignia worn on the shirt and/or hat." *See* NPS Manual at Ch. 6.s There is no indication in the record that Plaintiff ever received such a unform or was told to wear the requisite "VIP Insignia." Indeed, the only piece of identification provided to plaintiff was a badge with the label "Vendor" on it. *See* Opp. at 2.

More tellingly, the Reference Manual defines "volunteer" for purposes of the Volunteers-in-Parks program in accordance with 29 C.F.R. § 553.101, which provides that "[a]n individual who performs hours of service for a public agency for *civic*, *charitable*, or *humanitarian* reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a volunteer during such hours." In all, the legislative history and other agency documents do not support any reading of the relevant statutory text placing Plaintiff within FECA and outside of the FTCA.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's [8] Motion is **DENIED**. An appropriate Order accompanies this Memorandum Opinion.

Dated: March 11, 2022

/s/
**COLLEEN KOLLAR-KOTELLY**
United States District Judge