**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NANCY NORTON,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-cv-724 (GMH)** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Nancy Norton, who brought this action under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. § 2671 *et seq.*, alleges that while working at the 2019 White House Easter Egg Roll on the grounds of the White House, she tripped and fell on some unsecured wires, causing an injury that prevents her from working. She contends that Defendant United States of America ("Defendant" or "the government") is liable under a negligence theory for damages totaling $3.5 million. Defendant has filed a combination motion to dismiss and motion for summary judgment advancing three arguments—that the FTCA's waiver of sovereign immunity does not extend to the conduct at issue and the Court therefore lacks subject-matter jurisdiction; that even if the Court has subject-matter jurisdiction, Plaintiff cannot establish that Defendant had constructive notice of the allegedly dangerous condition that caused her injury as required to establish its liability; and that even if the Court has subject-matter jurisdiction and a reasonable fact-finder could determine that the government had constructive notice of the condition, Plaintiff's potential damages should be capped at $1,000,000 under the FTCA.[1] For the reasons that follow, the Court finds that it has

---

[1] The documents most relevant to this Memorandum Opinion and Order are: (1) Defendant's Motion for Summary Judgment and its exhibits, ECF Nos. 66 through 66-14; (2) Plaintiff's Opposition and its exhibits, ECF Nos. 68 through 68-9; and (3) Defendant's Reply, ECF No. 72. The page numbers cited herein are those assigned by the Court's CM/ECF system.

subject-matter jurisdiction over this action and that the government is not entitled to summary judgment on the issue of liability; however, Plaintiff has not established that she is entitled to seek more than $1 million in damages.  Accordingly, the government's motion is granted in part and denied in part.

## I.    BACKGROUND

### A.    Facts[2]

The jurisdictional issue depends largely on the agreements entered into among various entities regarding the production of the 2019 White House Easter Egg Roll, so the material details of those agreements are outlined at the start.  This section then sets out relevant evidence regarding Plaintiff's fall and injuries, followed by evidence related to the placement and condition of the wires or cables (the terms are used interchangeably here) on which she tripped.

#### 1.    Relevant Agreements Regarding the White House Easter Egg Roll

The White House grounds, including the South Lawn and the Ellipse, are part of the National Park System and are regulated and administered by the National Park Service ("NPS").  *See* ECF No. 66-4 at 1.  In early February 2018, NPS, the White House Office ("WHO"), and the White House Historical Association ("WHHA" or the "Association") executed an agreement (the "Sponsorship Agreement") dividing responsibilities among the three entities and setting other terms in connection with the White House Easter Egg Roll for the years 2018, 2019, and 2020, all of which were to occur on the South Lawn and the Ellipse.  *See generally* ECF No. 66-4.

According to the Sponsorship Agreement, NPS agreed to co-sponsor with WHO the 2018–2020 Easter Egg Rolls and to communicate and coordinate with WHHA in planning and executing

---

[2] Except where noted, the facts below are undisputed (or deemed undisputed) either because they have been admitted in Plaintiff's response to Defendant's Statement of Material Facts or because they appear in the record without contradiction from other evidence in the record.

the events, including by issuing a permit to WHHA to use the South Lawn and Ellipse. *See id.* at 2. NPS was to provide appropriate levels of law enforcement and traffic control, personnel to clean up after the events, utility service, stage facilities and fencing, emergency services including first aid, and public health inspections for food and beverage services. *See id.* at 2–3. As to liability, NPS "accept[ed] responsibility for any damages, losses, judgments, and expenses arising out of or from any omission or acts of its employees and contractors in connection with [NPS's] activities under th[e] [Sponsorship Agreement]." *Id.* at 3. Co-sponsor WHO authorized access to the South Lawn and Ellipse and agreed to provide emergency services and equipment, both in coordination with NPS. *See id.* at 4–5. It also took responsibility for printed materials; ticket distribution; credentials for federal employees for the purpose of set-up, execution, and take down of the Easter Egg Roll; and a sound system. *See id.* at 5. WHHA's primary duty under the Sponsorship Agreement was to "enter into a Service Agreement with an event management firm hired to execute each year's [Easter Egg Roll]" at no expense to the U.S. government, subject to approval by WHO and NPS. *Id.* at 5–6. WHHA also agreed to, among other things, "facilitate close cooperation" between that firm and WHO and NPS regarding the planning, implementation, and administration of the Easter Egg Rolls and to develop a plan to spend the amount budgeted for each year's event, an amount that could be amended with written consent of all parties to the Sponsorship Agreement. *Id.* at 6, 9. As for liability, the Association "accept[ed] responsibility for any damages, losses, judgments and expenses arising out of or from any acts or omissions of its employees and agents in connection with its activities under [the Sponsorship] Agreement." *Id.* at 10. It further promised that the agreement between it and the event management firm would require that firm to "[b]e fully responsible for the management, performance, use and safety of the elements provided by it and to indemnify" both WHHA and the United States of America from

any actions, claims, or liabilities arising out of the actions or omissions of the event management company, including its subcontractors and agents, "except in the case where such obligations or liabilities arise from the United States of America's or the WHHA's negligence or misconduct." *Id.* at 11.

In March 2019, WHHA entered into a contract (the "Service Agreement") with a company called Harbinger to produce the 2019 Easter Egg Roll, to be held on April 22, 2019.  ECF No. 66-5 at 1; *see also* ECF No. 68-1 at 30, ¶ 8.  The Association hired Harbinger "to execute the [Easter Egg Roll] and to work with WHHA, the NPS and the White House Office in planning, developing, implementing, and administering" the event.  ECF No. 66–5 at 1.  Harbinger agreed to "perform all production services and elements necessary and appropriate" for the event "subject to the direction and supervision of WHHA and WHAA's Partner(s)"—that is, NPS and WHO— including providing such things as restrooms; trash facilities; overnight security; on-site management for set-up, execution, and tear down; A/V services with the approval of NPS; food and beverage; and contract management for third-party vendors.  *Id.* at 1–2.  According to the Service Agreement, Harbinger's work was "subject to inspections and approval by WHHA and its Partners."  *Id.* at 2; *see also id.* at 4 (acknowledging that Harbinger's work was "subject to inspections and approval by NPS"); *id.* at 5 ("All work performed in connection with the [Easter Egg Roll] will be subject to inspections and approval by the NPS.").  Any change to the budget required the approval of "WHAA and [its] Partner(s)" and Harbinger was prohibited from entering into contracts on WHAA's behalf without similar prior approval.  *Id.* at 2–3. WHHA indemnified Harbinger from any actions, claims, or liabilities arising out of the actions or omissions of WHHA, except if such obligations or liabilities arose from Harbinger's negligence or misconduct.  *See id.* at 3.  Harbinger was made "fully responsible for the management, performance, use, and safety of

the elements to be provided by it" and indemnified the United States of America and WHHA from any claim, demand, or liability that arose from the actions or omissions of Harbinger, including its subcontractors, unless those obligations or liabilities arose from the United States of America's or WHHA's negligence or misconduct. *See id.* at 4.

        2.      Plaintiff's Fall and Injuries

Plaintiff testified at a deposition that she worked at the 2019 Easter Egg Roll handing out drinks on the Ellipse. *See* ECF No. 66-6 at 2 (excerpts from Plaintiff's deposition transcript); *see also* ECF No. 66-11 at 2–3 (Plaintiff's answers to the government's Interrogatories). At approximately 3:30 p.m., she had a break and walked over to the South Lawn. *See* ECF No. 66-6 at 3. She was walking with another person in a crowd of people on an asphalt path through the South Lawn when she fell, hitting her knees, lip, nose, left elbow, hands, and wrist. *See id.* at 5. Plaintiff was taken to the medical tent, where she was told she had tripped on loose wires. *See id.* at 7; *see also* ECF No. 66-11 at 3; ECF No. 68-1 at 31, ¶ 10. She was then taken to George Washington University Hospital and after a series of x-rays was diagnosed with a fractured olecranon process of the left elbow. *See* ECF No. 66-6 at 8; *see also* ECF No. 66-11 at 3, 8.

Three days after the event, on April 25, 2019, Plaintiff had surgery to repair the fracture. *See* ECF No. 66-12 at 1. Documentation of that procedure reflects that, prior to surgery, medical personnel warned her of its risks, including nerve damage and the possibility that further surgical intervention would be necessary. *See id.* At a physical therapy intake examination in early June 2019, Plaintiff reported pain in the left elbow and in both wrists that prevented her from putting weight on them. *See* ECF No. 66-13 at 1. The long-term goals of her physical therapy included "return[ing] to the full duties of her job as a podiatrist" in eight weeks. *See id.* at 2. That goal was not met: The next medical document in the record before the Court is an examination note by

orthopedist Michael Marion, M.D. from September 8, 2020, observing that an electrodiagnostic evaluation in August 2019 "revealed demyelinating and early axonal ulnar nerve neuropathy in the left elbow" and a later electrical study showed evidence of permanent nerve damage. ECF No. 66-14 at 1–2. At that visit, Plaintiff reported that she was unable to perform "the functions that are the key elements of her job" as a podiatrist and the physician "agree[d] that she [was] incapable of doing her previous job" and would likely "continue to exhibit significant weakness in the left hand and arm that [would] prevent her from returning" to that job. *Id.* at 2.

### 3. Placement and Condition of the Cables at Issue

All parties agree that CMI, a subcontractor engaged by Harbinger, placed the wire or cable on which Plaintiff alleges she tripped. *See* ECF No. 68-1 at 31–32, ¶ 13; *see also* ECF No. 66-8 at 2; ECF No. 66-9 at 2. Some other details are murkier. Shaun Hart, a project manager from CMI, *see* ECF No. 66-8 at 3, testified at a deposition that CMI personnel placed a fiber optic cable across the path sometime before 10:00 a.m. on the day of the Easter Egg Roll and the cable was "likely" secured (or "taped") at that time. *See* ECF No. 68-9 at 2–3, 6–7. CMI personnel did not check that cables were properly secured except at the time they were initially laid and did not tape any wires during the actual event. *See id.* at 7–8. Harbinger testified that its staff performed walk-throughs aimed at checking for safety hazards prior to the event and every two hours during the event. *See* ECF No. 66-8 at 4–7; ECF No. 68-4 at 4. Harbinger was not, however, involved in securing wires or cables. *See* ECF No. 68-4 at 2. Wendy Braswell, an individual who had been working with Plaintiff at the Ellipse, testified that about 30 minutes after she was informed of Plaintiff's fall, she went to the spot where she believed the fall had occurred. ECF No. 68-1 at 31, ¶ 12; *see also* ECF No. 66-7 at 2–3. She observed that the wires or cables crossing the path at the site were largely protected by a hard plastic covering; however, approximately a foot of wiring

between the covering and the edge of the path was exposed.  *See* ECF No. 66-7 at 4.  She and a colleague then taped that wiring down with gaffer's tape.  *See id.*  Braswell's testimony jibes with another undisputed fact: the government has admitted that the wires on which Plaintiff fell were not taped down until after the accident, *see* ECF No. 68-9 at 3, so that fact is "conclusively established," Fed. R. Civ. P. 36(b).[3]

## B.    Procedural History

On August 6, 2019, Plaintiff, through her attorney, submitted a Standard Form 95[4] to the FTCA Litigation Section of the Department of Justice, reporting the basis of her claim—a fall at the 2019 Easter Egg Roll that "fractured [the] olecranon process of the ulna," causing "nerve damage" and consequent "atrophy to the left hand"—and seeking $1,000,000 in damages.  ECF No. 45-2 at 2.  The claim was eventually routed to the proper agency, NPS, on July 13, 2020.[5]  *See*

---

[3] In response to Plaintiff's Requests for Admissions, the government admitted "that the wires on which Nancy Norton fell were not taped down until after the [f]all" and that "the wires on which Nancy Norton fell were taped down by Wendy Braswell and Malinda Davis after the [f]all."  ECF No. 68-9 at 3.  "A matter admitted" pursuant to a request for admission "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  Fed. R. Civ. P. 36(b); *see also DCFS USA, LLC v. District of Columbia*, 803 F. Supp. 2d 29, 35 (D.D.C. 2011) (prohibiting a litigant from presenting evidence to undermine a fact admitted in response for a request for admission).  There has been no motion to amend or withdraw those answers.  They have therefore been established for the purposes of this motion, at least, which is the only dispute currently before the Court.  The Court takes no position at this time as to the effect of the government's admission that the wires on which Plaintiff fell were not taped down until after the accident might have on the evidence admitted at trial.  *See, e.g., Estate of Gaither ex rel. Gaither v. District of Columbia*, No. 03-cv-1458, 2013 WL 12320099, at *2 (D.D.C. Jan. 2, 2013) (refusing to allow at trial evidence contradicting an admission made in response to a request for admission).

[4] As the D.C. Circuit has explained:

> Standard Form 95, titled "Claim for Damage, Injury or Death," is a two-sided form requesting the details of tort claims against the United States.  It instructs claimants to describe the incident causing the injury, to state the amount of the claim in dollars, and to provide information regarding witnesses to the incident and insurance coverage.

*GAF Corp. v. United States*, 818 F.2d 901, 906 n.16 (D.C. Cir. 1987).

[5] The Department of Justice originally forwarded the claim to the White House on September 24, 2019.  *See* ECF No. 45-3 at 2.  The Office of White House Counsel then forwarded it to NPS in July 2020.  *See id.* at 1.  In the interim, Plaintiff filed an action in this Court, which was dismissed without prejudice for failure to exhaust administrative remedies.  *See Norton v. United States*, 530 F. Supp. 3d 1 (D.D.C. 2021).

ECF No. 45-3. Pursuant to 28 U.S.C. § 2675, if NPS failed to "make final disposition of the claim within six months" after that date, Plaintiff could deem the failure to act a denial and file suit in federal court. 28 U.S.C. § 2675(a). There is no evidence in the record that NPS made a final disposition of Plaintiff's claim by January 13, 2021, and Plaintiff filed this action on March 19, 2021. *See* ECF No. 1.

Plaintiff's complaint survived a motion to dismiss, *see Norton v. United States*, No. 21-cv-724, 2022 WL 741851 (D.D.C. Mar. 11, 2022), after which the parties consented to the jurisdiction of a magistrate judge for all purposes and the case was assigned to the undersigned, *see* ECF No. 15 at 3; ECF No. 16; Minute Entry (Apr. 18, 2022). Thereafter, the parties engaged in an extended period of discovery and mediation. The parties participated in multiple mediation sessions with Judge S. Martin Teel during a period beginning on October 6, 2022, and ending unsuccessfully on December 18, 2024. *See* ECF No. 20; Minute Order (Jan 19, 2023); Minute Order (Feb. 17, 2023); Minute Order (Mar. 1, 2023); ECF No. 38; ECF No. 61. The discovery period was extended multiple times at the parties' request and finally ended—at least according to the final scheduling order entered by the Court—on December 5, 2024.[6] *See* ECF No. 17; ECF No. 35; ECF No. 37; ECF No. 40; ECF No. 43; ECF No. 52.

Meanwhile, on January 8, 2024, Plaintiff filed an amended Standard Form 95 with NPS claiming damages of $3.5 million. *See* ECF No. 45-5 at 2. On March 14, 2024, Plaintiff filed a motion to amend the *ad damnum* clause of her complaint to reflect a demand for $3.5 million in damages, citing opinions by Dr. Marion that Plaintiff could not return to work and a September 8, 2022, expert report estimating Plaintiff's lost earnings at more than $1.8 million. *See* ECF No. 45-

---

[6] While discovery and mediation were ongoing, the government filed a third-party complaint against Harbinger for indemnification or contribution. *See* ECF No. 28. That claim is not at issue here. There was a limited extension of the December 5, 2024, discovery deadline to allow Harbinger to depose Plaintiff. *See* Minute Order (Jan. 10. 2025).

1 at 2–3; ECF No. 45-4.  In response, the government filed a notice that it did not oppose the motion to amend but "expressly reserve[d] the right to move for summary judgment on the issue of whether Plaintiff's amended demand comports with 28 U.S.C. § 2675(b)"—which  prohibits a plaintiff from seeking more damages than sought in the claim presented to the agency, with exceptions where the increase is based on evidence not reasonably discoverable at the time of the claim or on intervening facts—"at a later point if further discovery reveals that the United States is entitled to summary judgment on [the] issue."  ECF No. 49 at 1.  Based on those representations, the Court granted Plaintiff's motion.  *See* ECF No. 50.

Thereafter, the government filed its motion to dismiss and for summary judgment on Plaintiff's claims against it, which Plaintiff opposes in full.  *See* ECF No. 66-1; ECF No. 68-1; ECF No. 72.

## II.    LEGAL STANDARD

### A.    Rules 12(b)(1) and 12(h)(3)

The "plaintiff bears the burden of establishing" subject matter jurisdiction.  *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 177 (D.D.C. 2007); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  A motion to dismiss under Rule 12(b)(1) "presents a threshold challenge to the court's [subject-matter] jurisdiction" and concerns a court's ability to hear a particular claim.  *Thomas v. Wash. Metro. Area Transit Auth.*, 305 F. Supp. 3d 77, 81 (D.D.C. 2018) (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)); *see* Fed. R. Civ. P. 12(b)(1).  "Rule 12(h)(3) requires a federal court to dismiss a case when it determines upon motion filed under Rule 12(b)(1) or otherwise that it lacks subject matter jurisdiction."  *Auleta v. United States Dep't of Just.*, 80 F. Supp. 3d 198, 201 (D.D.C. 2015) (citing Fed. R. Civ. P. 12(h)(3)).  In weighing  a Rule 12(b)(1) motion, courts must "'accept as true all of the factual allegations

contained in the complaint' and draw all reasonable inferences in favor of the plaintiff." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011) (quoting *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008)). But courts are "not required . . . to accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations." *Id.* (alteration in original) (quoting *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001)). Further, "a court 'may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *O'Gilvie v. Corp. for Nat'l Cmty. Serv.*, 802 F. Supp. 2d 77, 80–81 (D.D.C. 2011) (quoting *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000)). A motion to dismiss under Rule 12(h)(3) "is subject to the same standards as a Rule 12(b)(1) motion to dismiss for lack of jurisdiction." *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, 605 F. Supp. 3d 157, 163 (D.D.C. 2022) (citing *Murray v. Amalgamated Trans. Union*, 206 F. Supp. 3d 202, 207 (D.D.C. 2016)).

### B.    Rule 56(a)

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The "reasonable-jury standard" "still appl[ies] in the event of a bench trial because 'the law of summary judgment does not vary with this circumstance.'" *Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 143 n.2 (D.D.C. 2016) (quoting *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732,

738 (D.C.Cir.1990)).  Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting former Fed. R. Civ. P. 56(e)).  To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party, *Anderson*, 477 U.S. at 252.  Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute).

A court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine dispute for trial." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).  It is well-established that "[c]redibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Id.* (quoting *Pardo-Kronemann*, 601 F.3d at 604).

## III.    DISCUSSION

"Ordinarily, a federal court must satisfy itself that it has subject-matter jurisdiction before addressing any other defense." *WE Charity v. Canadian Broad. Corp.*, 679 F. Supp. 3d 1, 13 (D.D.C. 2023). Accordingly, the Court first resolves the government's jurisdictional challenge before turning to the argument that the government is entitled to summary judgment as to liability and, thereafter, that Plaintiff's damages must be capped at $1 million pursuant to the FTCA.

### A.    The Court Has Subject-Matter Jurisdiction Over This Matter.

The government possesses sovereign immunity, and therefore "may not be sued without its consent." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (quoting *United States v. Mitchell*, 463 U.S. 206, 212 (1983)). "[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *Hercules, Inc. v. United States*, 516 U.S. 417, 422 (1996) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). The FTCA is an example of such consent, waiving sovereign immunity so that the government may be sued

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The FTCA "defines Government employees to include officers and employees of 'any federal agency' but excludes 'any contractor with the United States.'" *United States v. Orleans*, 425 U.S. 807, 813–14 (1976) (citation modified) (quoting 28 U.S.C. § 2671). Therefore, Congress has expressly stated that the waiver of sovereign immunity in the FTCA does

not extend to the acts or omissions of contractors.  This is often referred to as the "independent contractor exception" to the FTCA.  *Id.* at 814.

Although the only dispositive motion before this Court was filed by the government, it is Plaintiff who must demonstrate that this Court possesses subject-matter jurisdiction to hear her claims, as "[the] party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity."  *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [a federal court's] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." (citations omitted)).

Plaintiff proffers two independent paths to establishing subject-matter jurisdiction: (1) a direct allegation of negligence against the government through its own employees, a straightforward application of Section 1346(b)(1); and (2) an allegation of negligence for the actions of the government's contractors to whom she argues the "independent contractor exception" of the FTCA does not apply.  ECF No. 68-1 at 15.  Although Plaintiff's attempt to find a way around the "independent contract exception" fails, because she has stated a plausible claim of negligence against the government for the acts or omissions of its own employees, this Court finds that it has subject-matter jurisdiction over this matter on that basis and denies the government's motion to dismiss under Rules 12(b)(1) and 12(h)(3).

> 1.    The Independent Contractor Exception Applies to Plaintiff's Negligence Claim Related to the Acts of WHHA, Harbinger, and CMI.

The Court begins by addressing the second path to subject-matter jurisdiction propounded by Plaintiff—that the government is liable for the negligent acts and omissions of its contractors because the government supervised their actions such that the "independent contractor exception"

cannot apply.  ECF No. 68-1 at 19–21.  This argument fails, and this Court finds that it does not have subject-matter jurisdiction over any claim of negligence to the extent it is based on the acts or omissions of WHHA, Harbinger, or CMI.

As stated above, the FTCA waives sovereign immunity only for claims based upon the tortious acts or omissions of "employees of the Government," 28 U.S.C. § 1346(b)(1), but contains the so-called "independent contractor exception" that explicitly excludes the acts or omissions of contractors from its waiver, *id.* § 2671.  "[T]he critical factor in making [the] determination [of whether an actor is an employee or independent contractor of the principal] is the authority of the [government] to control the detailed physical performance of the contractor." *Logue v. United States*, 412 U.S. 521, 527–28 (1973).  Stated differently, the key inquiry in determining whether an actor is an employee or an independent contractor is "whether its day-to-day operations are supervised by the Federal Government." *Orleans*, 425 U.S. at 815.  In making that determination, the Supreme Court has directed that "[t]he Federal Government in no sense controls 'the detailed physical performance' of *all* the programs and projects it finances by gifts, grants, contracts, or loans." *Id.* at 816 (emphasis added) (quoting *Logue*, 412 U.S. at 528).  Rather, "the government may 'fix specific and precise conditions to implement federal objectives' without becoming liable for an independent contractor's negligence." *Macharia v. United States*, 334 F.3d 61, 68–69 (D.C. Cir. 2003) (quoting *Orleans*, 425 U.S. at 816).

Here, Plaintiff offers no evidence that indicates that the government controlled the performance of WHHA, Harbinger, or CMI to the extent necessary to override the independent contractor exception.

Plaintiff points to several sections of the Service Agreement that she alleges demonstrate that the government controlled their performance.  First, she points to the fact that under the

Service Agreement, "Harbinger was expected to 'work with' NPS in putting on the event."  ECF No. 68-1 at 19 (citing ECF No. 66-5 at 1).  Such broad and vague language provides an insufficient basis to find that the government "control[led]" Harbinger's "detailed physical performance," *Logue*, 412 U.S. at 527, or "supervised" its "day-to-day operations," *Orleans*, 425 U.S. at 815. The government is permitted to "work with" contractors without converting them into its employees.  *See, e.g.*, *Verizon Washington, D.C., Inc. v. United States*, 254 F. Supp. 3d 208, 217 (D.D.C. 2017) (finding that a contract calling for the contractor to "coordinate with the Government" did not override the independent contractor exception).  Plaintiff then notes that, per the Service Agreement, "Harbinger's work was 'all subject to the direction and supervision of [NPS],'" ECF No. 68-1 at 19 (citing ECF No. 66-5 at 1), and that "[t]he work of any subcontractor Harbinger hired was also subject to inspection and supervision by NPS," *id.* at 20 (citing ECF No. 68-4 at 3).  But courts have consistently held, based on the Supreme Court's decision in *Orleans*, that the government may reserve in a contract with a private party a general right to supervise or inspect the work of the contractor "without vitiating the independent contractor exception."  *Hsieh v. Consol. Eng'g Servs., Inc.*, 569 F. Supp. 2d 159, 177 (D.D.C. 2008) (citing *Orleans,* 425 U.S. at 815).  Indeed, "[b]ecause the Government usually receives a right of general supervision in contracts with private parties in order to ensure that the contract obligations are being met, 'the fact of broad, supervisory control or even the potential to exercise even detailed control, cannot convert a contractor into an agent.'"  *Jennings v. United States*, 530 F. Supp. 40, 44 (D.D.C. 1981) (citations omitted); *cf. Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195, 1233 n.30 (D.C. Cir. 2018) (Randolph, J., dissenting) ("If the right to inspect and exercise a general supervision destroys the independence of the contractor, then . . . there would be no such thing as an independent contractor, because no one [would] let a contract without reserving the right to see

that it is performed in accordance with the contract." (quoting *Bokoshe Smokeless Coal Co. v. Morehead*, 126 P. 1033, 1036 (Okla. 1912))).

Also unavailing is Plaintiff's argument that, under the Service Agreement, Harbinger could not, without the approval of NPS, perform the following actions: change the budget for the Easter Egg Roll; enter any contractual agreements on behalf of or that committed WHHA funds; film or record the Easter Egg Roll; or disclose non-public information. ECF No. 68-1 at 20. Each of these restrictions, at most, falls within the category of a "specific and precise condition[]" which the government may "fix" "'to implement federal objectives' without becoming liable for an independent contractor's negligence."[7] *Macharia*, 334 F.3d at 68–69 (quoting *Orleans*, 425 U.S. at 816).

In *Macharia*, for example, the plaintiffs, who were injured during a terrorist attack on the U.S. Embassy in Kenya, sued the government alleging that it negligently failed to secure the embassy and warn them of the attack. *Id.* at 63. The government had delegated to a contractor safety and security responsibilities for the premises. *Id.* The court found that the independent contractor exception applied even though the government "regularly provided advice regarding the contracts," controlled the uniforms of its contractor's guards, and directed the way in which the contractor took inventory. *Id.* at 68. Similarly, in *Hamilton v. United States*, the government hired a contractor to manage the electronic monitoring of criminal defendants. 502 F. Supp. 3d 266, 270 (D.D.C. 2020). This contract provided "detailed instructions" for how the contractor should conduct electronic monitoring, including requirements for the fit, durability, and signal range of the devices utilized, as well as "specific directives with respect to stay away orders," such

---

[7] These restrictions probably even fall short of being "specific and precise." *Macharia*, 334 F.3d at 68 (quoting *Orleans*, 425 U.S. at 816). The provisions offered by Plaintiff seem to be standardized contractual provisions that say nothing of the specific performance of the contractor.

as how the contractor's violation warning system should operate. *Id.* at 275–76. *Hamilton* held that these "specific and precise conditions" did not render the independent contractor exception inapplicable. *Id.* at 276–77. In *Davis v. United States*, meanwhile, the government contracted with a sheriff's office to handle government-owned canines at certain events. 196 F. Supp. 3d 106, 111–12 (D.D.C. 2016). Under this contract, the government trained the handlers and provided them with certifications. *Id.* at 112. Further, the contract set quotas for the amount of time canine-handlers needed to spend searching cargo and the amount of time they needed to be stationed in different patrol environments. *Id.* at 115. Despite these conditions, *Davis* found that the independent contractor exception applied. *Id.* There are no facts in the instant case that come close to the level of control demonstrated in *Macharia*, *Hamilton*, or *Davis*—all cases in which courts found the government did not have the authority to "control the detailed physical performance of the contractor." *Logue*, 412 U.S. at 528. The restrictions at issue here that prevented Harbinger from changing the overall budget of a contract, entering contracts on WHHA's behalf, filming or recording the project, or disclosing non-public information fall well short of the level of control required to overcome the independent contractor exception as articulated in *Logue* and *Orleans*.[8]

Plaintiff points separately to a clause in the Sponsorship Agreement, asserting that the government "assumed liability 'for any damages, losses, judgments, and expenses arising out of or from any omission or acts of its employees and contractors in connection with [NPS's] activities under this Agreement.'" ECF No. 68-1 at 20 (quoting ECF No. 66-4 at 3). This clause also cannot

---

[8] Moreover, the notion that the independent contractor exception could be rendered inapplicable by including such basic restrictions must be false, because if similar restrictions converted a contractor to an employee, "then there would be no such thing as an independent contractor." *Browning-Ferris*, 911 F.3d at 1233 n.30 (quoting *Bokoshe*, 126 P. at 1036). Surely a principal's direction that a contractor not, for instance, change without permission the budget of the project on which the contractor is working would not convert the contractor into an employee. Otherwise, few principals would ever hire a contractor.

make the government responsible for the acts or omissions of its contractors. As stated above, it is well-established that the government may only be sued where it has consented to be sued. *See Meyer*, 510 U.S. at 475; *Mitchell*, 463 U.S. at 212; *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 280 (1983). It is also axiomatic that "[b]eyond the letter of such consent the courts may not go . . . ." *Stradley v. Cap. Transit Co.*, 87 F. Supp. 94, 95 (D.D.C 1949) (quoting *Schillinger v. United States*, 155 U.S. 163, 166 (1894)); *see also United States v. Kubrick*, 444 U.S. 111, 118 (1979) (stating that when interpreting a waiver of sovereign immunity, courts "should not take it upon [them]selves to extend the waiver beyond that which Congress intended"). Here, Congress explicitly excluded contractors from the FTCA's waiver of sovereign immunity. 28 U.S.C. §§ 1346(b), 2671. Thus, even if this Court were to find that the contractual language to which Plaintiff points would impose on a private person liability for the acts or omissions of his or her contractors, Plaintiff's argument still fails. Federal agencies may not contract to assume more liability in tort than permitted by Congress. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1105 (D.C. Cir. 2005) ("Sovereign immunity may not be waived by federal agencies."); *cf. Nat'l Audubon Soc., Inc. v. Watt*, 678 F.2d 299, 307–08 (D.C. Cir. 1982) ("It is well established that a government official may not bind the United States by entering into a contract to perform unauthorized acts." (citing *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917); *United States ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 118 (2d Cir. 1949))). This Court declines Plaintiff's request to interpret the Sponsorship Agreement—a contract to which neither Harbinger nor its subcontractor CMI were parties[9]—to expand the government's liability in tort beyond Congress's consent. *See Hatchell v. United States*, 776 F.2d 244, 246 (9th Cir. 1985) ("In the face of clear statutory language, [a court] cannot 'enlarge that consent to be sued which the

---

[9] It is also unclear whether Harbinger and CMI can even be considered the government's contractors, at all, as the government is not in direct privity of contract with these entities. *See* discussion *infra* Section III.A.2.b.

government, through Congress, has undertaken so carefully to limit.'" (quoting *Claremont Aircraft, Inc. v. United States*, 420 F.2d 896, 898 (9th Cir. 1970))).

Based on the evidence before this Court, the government clearly did not control WHHA, Harbinger, or CMI to the extent necessary to be liable for their purported negligence. As such, the independent contractor exception of the FTCA applies and Plaintiff's second path to subject-matter jurisdiction fails.

> 2.    This Court Has Subject-Matter Jurisdiction Over the Direct Negligence Claim Against the Government.

The first path to jurisdiction laid by Plaintiff—that the government itself, through its employees, was negligent—fares better. It is based solely upon a premises liability theory seeking to hold the government directly responsible for its alleged failure to keep the White House grounds safe on the day in question. ECF No. 68-1 at 15. Plaintiff asserts that "the United States, as the host of the [Easter Egg Roll] and the owner of the White House grounds, had a well-established duty to keep the premises safe for attendees and to alleviate any dangerous conditions that existed thereon." *Id.* Plaintiff further contends that the government's landowner duty encompassed other duties that it breached on the day of the event, such as "a duty to maintain the White House, including the grounds and asphalt walkway, in a reasonably safe condition for the safe use of event attendees," "a duty to correct and alleviate any dangerous conditions on the asphalt walkway that posed a risk of injury or harm to event attendees," and "a duty to warn event attendees of any dangerous conditions on the asphalt walkway, and to place appropriate warnings or warning signs in areas where such dangerous conditions existed." *Id.* at 16–17 (quoting ECF No. 45-7 at 6).

As stated above, the FTCA provides jurisdiction only for suits in which the government, "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Thus, in actions brought under the FTCA,

courts "look to the law of the local jurisdiction . . . to determine whether there is a local private party analog" to a plaintiff's claims. *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 508 (D.C. Cir. 2009). As relevant here, it is well-established that an FTCA action for negligence may be brought against the federal government under a premises liability theory, and that in such cases, the government possesses a landowner duty identical to the one imposed on private landowners in that jurisdiction. *Nelson v. United States*, 838 F.2d 1280, 1285–86 (D.C. Cir. 1988). Applying that principle here, District of Columbia law imposes on landowners "a duty of reasonable care [owed] to all persons, including both invitees and licensees, who are lawfully on the landowner's premises." *Boyrie v. E & G Prop. Servs.*, 58 A.3d 475, 477 (D.C. 2013); *see also Sandoe v. Lefta Assocs.*, 559 A.2d 732, 738–43 (D.C. 1988) (discussing landowner duty in the District of Columbia). What constitutes "reasonable care under the circumstances" is a question of fact for a jury, *Sandoe*, 559 A.2d at 743, and "[t]he factors to be weighed in the determination of the degree of care demanded in a specific situation are 'the likelihood that [the landowner's] conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which [the landowner] must sacrifice to avoid the risk,'"[10] *id.* at 740 (second and third alterations in original) (emphasis omitted) (quoting *Smith v. Arbaugh's Restaurant, Inc.*, 469 F.2d 97, 105–06 (1972)). Importantly, under D.C. law, "depending on the circumstances, the landowner's duty of reasonable care to persons lawfully upon the premises may include a duty to inspect the premises for latent, dangerous defects."[11] *Id.* at 744.

---

[10] The District of Columbia Court of Appeals has also said that "the issue of constructive notice . . . is necessary to determine whether [a defendant] owe[s] a duty of care to [the plaintiff]." *Leach v. One Parking 555, LLC*, 319 A.3d 415, 420 (D.C. 2024). This Court addresses the issue of constructive notice in full in its analysis of the government's motion under Rule 56. *See* discussion *infra* Section III.B.

[11] Whether a duty to inspect is owed in a particular circumstance is generally a question of fact to be resolved at trial. *See Sandoe*, 559 A.2d at 742–43; *see also D.C. Hous. Auth. v. Pinkney*, 970 A.2d 854, 869 n.15 (D.C. 2009) (noting that "a landowner has the 'duty to perform such inspections *as a reasonable person would find necessary to detect or learn about any dangerous condition*'" (emphasis added) (quoting Standardized Civil Jury Instructions for the District

This path to subject-matter jurisdiction hinges on whether the government owed this landowner duty to Plaintiff on the day of the Easter Egg Roll. *See Boutaugh v. District of Columbia*, 335 A.3d 528, 532 (D.C. 2025) ("In order to establish a claim for negligence . . . , 'the plaintiff must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach.'" (quoting *Hoodbhoy v. District of Columbia*, 282 A.3d 1092, 1096 (D.C. 2022))). Plaintiff maintains that the government owed her and other patrons this duty at the time she was injured, ECF No. 68-1 at 16–17 (citing ECF No. 45-7 at 6), while the government contends that any duty of care owed to Plaintiff was fully delegated to independent contractors, ECF No. 66-1 at 15–18. As discussed below, although the government is capable of delegating all relevant landowner duties to an independent contractor, such a delegation must be clear and unambiguous. There is no such clear, unambiguous delegation here. Accordingly, the Court denies the government's motion to dismiss for lack of jurisdiction.

> a.    *The Government May Delegate Landowner Duties to Independent Contractors, Even Where State Common Law Would Typically Impose a Non-Delegable Duty Upon a Landowner.*

First, this Court must determine whether the government is permitted to delegate its landowner duty, at all. This question is central to the government's defense, because if such delegation was permissible and the duty was delegated in full, then it could not have owed a duty of reasonable care to Plaintiff on the day of the Easter Egg Roll and Plaintiff's claim should be

---

of Columbia, No. 10–3 (2002))). Here, however, the government does not argue that the responsible party had *no* duty to inspect for hazards about which it had actual or constructive notice; rather, it argues that it was not the responsible party. *See, e.g.*, ECF No. 72 at 5 ("[T]he record evidence here amply establishes that the United States expressly delegated responsibility for the safety of all elements provided by any service provider of the White House Historical Association to that service provider.").

dismissed. On this issue, the Court agrees with the government, and holds that, whatever landholder duty it may have owed to Plaintiff, the duty was delegable to a third-party.[12]

The delegability of the duty of reasonable care imposed on landowners by District of Columbia law is not entirely clear. Although the District of Columbia Court of Appeals has held that some duties related to land ownership are non-delegable, it does not appear that it has specifically addressed whether the non-delegable duty doctrine applies to the landowner duty more generally. *See, e.g.*, *W.M. Schlosser Co. v. Maryland Drywall Co.*, 673 A.2d 647, 651 (D.C. 1996) (District of Columbia landowner may not delegate the duty of care related to the performance of inherently dangerous activity on his or her property) (citing *Levy v. Currier*, 587 A.2d 205 (D.C. 1991); *see also Verizon Washington*, 254 F. Supp. 3d at 219–21 (recognizing that duty of care when performing inherently dangerous activity is non-delegable in D.C.). This Court, however, in interpreting District of Columbia law, has been clearer; it has held more broadly that "[a] person who invites the public to premises operated by him may not delegate to others or rely on others to perform the duty of maintaining the place in a reasonably safe condition, and relieve himself of the obligation in that manner." *Hafferman v. Westinghouse Elec. Corp.*, 653 F. Supp. 423, 430 (D.D.C. 1986) (quoting *Thomas v. Potomac Elec. Power Co.*, 266 F. Supp. 687, 693 (D.D.C 1967)).

Either way, this Court finds persuasive the Fourth Circuit's opinion in *Berkman v. United States*, holding that in actions brought under the FTCA, the government, as sovereign, *may*

---

[12] Plaintiff denies that she is asserting that the government has a non-delegable duty, ECF No. 68-1 at 17 n.5, and therefore waives this argument. *Jordan v. Fed. Bureau of Prisons*, No. 21-5217, 2024 WL 2932371, at *2 (D.C. Cir. June 11, 2024) ("A party waives an argument by 'intentional[ly] relinquish[ing] or abandon[ing]' it." (alterations in original) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993))). However, the Court addresses this argument anyway because the government invoked it, ECF No. 66-1 at 18, and because this Court has an independent obligation to determine its subject-matter jurisdiction, *Li v. Comm'r of Internal Revenue*, 22 F.4th 1014, 1015 (D.C. Cir. 2022) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)).

delegate duties to third parties, even when the applicable state law provides that they are typically non-delegable. 957 F.2d 108, 113 (4th Cir. 1992).

In *Berkman*, the plaintiff was injured at Dulles International Airport when he slipped on oil that had allegedly leaked from a hydraulic door onto the floor. *Id.* at 110–11. The government owned and operated the airport but had hired a contractor to maintain certain parts of it, including the floor. *Id.* at 111. The plaintiff brought a negligence suit against the government, arguing that the government owed under Virginia tort law, like all private Virginia landowners, a non-delegable duty to maintain the premises in a safe condition. *Id.* at 112. Thus, Berkman contended, the government should still be held liable for the unsafe floors at Dulles despite its delegation of this duty through contract. *Id.*

The Fourth Circuit rejected this argument, holding that the application of the non-delegable duty doctrine to the federal government would expand its liability in tort beyond the waiver of sovereign immunity in the FTCA. *Id.* at 112–13. Guided by the principle that "[c]laimants obtain their right to sue the federal government from Congress and they necessarily must take it subject to such restrictions as have been imposed," the court noted that "although the threshold inquiry into government liability as defined by the FTCA requires an examination of state law to define tortious conduct, the question of *whether* a state law tort can be applied against the United States is exclusively one of federal law." *Id.* at 112 (citation modified) (quoting *Dalehite v. United States,* 346 U.S. 15, 31 (1953)). Examining the structure of the statute, the court found that Congress "placed the focus, when determining the applicability to the United States of state tort law, upon the person or entity whose tortious conduct a plaintiff seeks to impute to the United States," waiving immunity not for the torts of the federal government's contractors, but "for the tortious conduct of its employees, and only its employees." *Id.* at 113 (emphasis omitted). Accordingly,

the FTCA requires a "focu[]sed approach" in which courts must "determine the relationship to the United States of the actor whose negligence might be imputed to the government under state law" and allow such imputation only where the actor is an employee of the federal government. *Id.* By necessary implication, then, the government must be able to delegate duties such as its "responsibility for the physical performance of the tasks involved in making land safe," *id.*; if it could not, Congress' distinction between employee and contractor would collapse. The D.C. Circuit endorsed the rationale of *Berkman* in *Clark v. United States*, citing it in support of the conclusion that "[t]he nondelegable duty doctrine is inapplicable to cases arising under the Federal Tort Claims Act." 52 F.3d 1122, at *1 (D.C. Cir. 1995) (per curiam). Thus, where a plaintiff has sued the government for the breach of duties it has delegated to independent contractors, the suit falls outside of the consent given by Congress in the FTCA, and the government remains protected by the independent contractor exception of the statute.

Finding *Berkman* and *Clark* persuasive, this Court holds that the government is permitted to delegate its landowner duty of reasonable care to a third party, regardless of whether D.C. law permits a private person or entity to do the same.

        b.     *The Government Did Not Clearly Delegate the Relevant Landowner Duties to Other Parties.*

Having determined that the government, as sovereign, *may* delegate its landowner duty, even to the extent it may be considered non-delegable under District of Columbia law, the Court's analysis then turns to whether the government *actually did* delegate it to WHHA, Harbinger, or CMI. To determine that question, the Court is guided by the standard for delegation set forth by the Supreme Court in *United States v. Seckinger*, 397 U.S. 203 (1970), and finds that, when "draw[ing] all reasonable inferences in favor of the plaintiff," *Schmidt*, 826 F. Supp. 2d at 65, the government did not meet that standard.

24

To reiterate, the relevant question is not whether WHHA, Harbinger, or CMI assumed any duty relevant to Plaintiff's fall in the contract, but rather whether the government retained any duty relevant to Plaintiff's fall.  This action has been brought against the government, and, as Plaintiff notes, "[t]he mere fact that Harbinger and CMI [may have] also [been] negligent does not absolve the United States of its own [alleged] negligence in failing to keep its property safe."  ECF No. 68-1 at 19; *see also R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 544 (D.C. 1991) ("Where the negligence of two defendants contributes to a single injury, both are jointly and severally liable, regardless of the degree of negligence on the part of each."  (citing *Hill v. McDonald*, 442 A.2d 133, 137–38 (D.C. 1982))).  Thus, in order to find it does not have subject-matter jurisdiction over the claims of negligence against the government for the acts or omissions of its own employees, this Court must find that the terms of the contract and the actions of the parties clearly indicate a *complete relinquishment* by the government of any landowner duty relevant to Plaintiff's injury.  The terms of the contracts here simply do not lend themselves to such a finding.

Again, District of Columbia case law does not paint a clear picture of what exactly constitutes a valid delegation of a landowner's duty of reasonable care.  *See* Section III.A.2.a, *supra*.  Federal law, however, directs that a valid delegation of duty from the government to a third party should be clear and unambiguous from the face of the contract.

In *Seckinger*, the Supreme Court addressed an indemnity action brought by the government against one of its contractors after one of the contractor's employees prevailed in a negligence suit brought against the government under the FTCA.  397 U.S. at 204–06.  The government argued that a clause in the governing contract that provided the contractor "shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with

the prosecution of the work" should allow it to recover damages paid in the underlying FTCA suit. *Id.* at 204, 208 n.9. In holding that "a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties," *id.* at 211, the Supreme Court articulated a guiding principle: "if the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intention of the parties to this effect should appear with clarity from the face of the contract." *Id.* at 212. The Supreme Court supported its invocation of this principle by citing its virtually unanimous acceptance by American jurisdictions[13] and its suitability in "situation[s] in which there is a vast disparity in bargaining power and economic resources between the parties, such as exists between the United States and particular government contractors." *Id.*

This principle and its underlying rationale are equally applicable here. Although indemnity and liability are distinct issues, *Seckinger* has been applied in examining the level of clarity required for the government to delegate other duties. *See United States v. English*, 521 F.2d 63, 67–68 (9th Cir. 1975) (applying the standard of *Seckinger* to determine whether a statutory duty of care imposed on employers by the California labor code was delegated); *see also Corrosioneering, Inc. v. Thyssen Env't Sys., Inc.*, 807 F.2d 1279, 1284 (6th Cir. 1986) ("Although indemnity and liability issues are in some sense 'separate and distinct,' they are nevertheless 'related.' Indeed, by its very nature indemnity is collateral to and dependent upon a finding of liability."). Ultimately, whether the issue is the delegation of an indemnity or a liability obligation, the government is in a better position than its contractors to determine and communicate which

---

[13] The District of Columbia Court of Appeals has repeatedly adopted *Seckinger*'s approach to interpreting indemnity provisions. *See, e.g.*, *W.M. Schlosser Co.*, 673 A.2d at 653; *District of Columbia v. Royal*, 465 A.2d 367, 369 (D.C. 1983).

duties it wishes to delegate and which duties it wishes to retain; if it wishes for such a delegation to be operative, the language it uses to do so should be clear.[14]  Several of this Court's holdings in similar cases comport with *Seckinger*, focusing on the clarity of the delegation of duty within the contract governing the relevant project or event.  *See, e.g.*, *Gray v. United States*, No. 21-cv-2310, 2022 WL 3758577, at *2 (D.D.C. Aug. 30, 2022) ("This language makes abundantly clear that [the contractor] was delegated the duty to maintain and repair the metal floor coverings of the building's guard booths."); *Wright v. J.E. Bach & Assocs.*, No. 95-cv-2056, 1996 WL 636439, at *3 (D.D.C. Oct. 24, 1996) (The "clear and undisputed language of the contract . . . delegated to [the contractor] the duty to maintain the stairs.").[15]

In the Sponsorship Agreement, the WHHA accepted "responsibility for any damages, losses, judgments and expenses arising out of or from any acts or omissions of its employees and agents in connection with its activities under this Agreement to the fullest extent permitted by law."  ECF No. 66-4 at 10.  The primary activity undertaken by the WHHA in the Sponsorship

---

[14] Requiring facial clarity also comports with the legal standard that binds this Court at this stage in the proceedings when ruling on a motion to dismiss under Rules 12(b)(1) and 12(h)(3), where a court must "draw all reasonable inferences in favor of the plaintiff."  *Schmidt*, 826 F. Supp. 2d at 65.  For this Court to find that the contract at issue delegated all relevant landowner duty to other parties, the contract would need to be clear and unambiguous, leaving no room for the reasonable inference that the government retained its landowner duty.  *See Williams v. Aviles*, No. 20-cv-931, 2020 WL 6158244, at *3 (D.D.C. Oct. 21, 2020) ("[A] court 'may dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief.'"  (alteration in original) (quoting *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 108 (D.D.C. 2013))), *aff'd*, No. 24-7004, 2024 WL 3299618 (D.C. Cir. July 2, 2024).

[15] Another standard that this Court has utilized in past FTCA cases is that a valid delegation of landowner duty occurs only when possession and control of the premises is transferred to another entity.  This standard aligns with the principle that, in the District of Columbia, the landowner duty of reasonable care "springs from *possession*, and it is 'not invariably [placed] on the person in whom the land is titled.'"  *Brown v. Consol. Rail Corp.*, 717 A.2d 309, 315 n.9 (D.C. 1998) (alteration in original) (quoting *Husovsky v. United States*, 590 F.2d 944, 953 (D.C. Cir. 1978)).  This standard was applied in *Simpkins v. United States*, where the court implied that in order to rid itself of landowner duty, the government would have needed to "transfer possession or ownership" or "exclusive control" over property to a different entity.  253 F. Supp. 2d 4, 8 (D.D.C. 2003).  Although this standard might have the advantage of easy application, it is unworkable in light of *Berkman* and *Clark*.  Under such a standard, the government would all but owe a non-delegable duty, because it would be unable to delegate its landowner duty unless it completely transferred ownership, possession, or control of its land.  Indeed, in *Simpkins*, the Court explicitly stated that the government was "unable to delegate its duty of care," *id.*, a statement which contravenes the teaching of *Berkman* and *Clark*.

Agreement was to hire an event management company, *id.* at 5–6, that was to "[b]e fully responsible for the management, performance, use and safety of the elements to be provided by it," *id.* at 11. This event management company was also to:

> [i]ndemnify, save and hold harmless and defend the [government] against all actions, claims, demands or liabilities arising out of the actions or omissions of such event management company or its directors, officers, employees, subcontractors, and agents, except in the case where such obligations or liabilities arise from the [government's] . . . negligence or misconduct.

*Id.* What this language clearly indicates is the government's desire to not be held liable for the negligence *of a contractor* and for the contractor to indemnify the government if the contractor's acts or omissions lead to legal action against the government.[16] None of it, however, clearly conveys a delegation of the entirety of the government's landowner duty under District of Columbia law, including any duty to maintain safe conditions, supervise, inspect, or warn attendees, to the WHHA or the then-unknown event management company, especially when all inferences are drawn in Plaintiff's favor. Several factors contribute to this conclusion.

First, the government was not even in direct privity of contract xzgovernment contends it shifted its landowner duty of care on the day of the Easter Egg Roll. *Contrast* ECF No. 66-4 at 16 (signature page of the Sponsorship Agreement), *with* ECF No. 66-5 at 8 (signature page of the Service Agreement). Logically, then, for Harbinger to assume all relevant landowner duty through operation of the Service Agreement, the government must have delegated all its relevant landowner duty to WHHA in the Sponsorship Agreement. The government's own theory of delegation acknowledges this, asserting that the government delegated all relevant duty to the WHHA, who, in turn, delegated it to Harbinger. ECF No. 66-1 at 17–18. Therefore, it should be

---

[16] This Court expresses no opinion at this juncture with respect to the government's claim for indemnity or contribution against Harbinger. *See* ECF No. 28.

clear *from the Sponsorship Agreement alone* that the government has delegated all its landowner

duty to WHHA.  But nowhere in that contract is WHHA clearly delegated any responsibility

related to ensuring the safety of the entire premises.  *See* ECF No. 66-4 at 5–12.  WHHA accepts

"responsibility for any damages, losses, judgments and expenses arising out of or from any acts or

omissions of its employees and agents in connection with its activities," *id.* at 10, and is also tasked

with hiring an event management contractor who will accept responsibility for the "safety of the

elements to be provided by it" *id.* at 11, but this language is certainly not enough to conclude that

the government clearly delegated, and WHHA accepted, *the entirety* of the government's

landowner duty, under District of Columbia law, including any duty to maintain safe conditions,

and supervise and inspect the property, or warn attendees of dangers that were present.  Indeed,

under the Sponsorship Agreement, only NPS and WHO were said to be responsible for any tasks

related to the safety of the event as a whole; WHHA is not mentioned in that regard at all.  Nor is

any reference made to the then-unknown event management company's responsibility for premises

safety or assumption of the government's landowner liability.  *Id.* at 2–5.  Nor has the government

provided any legal authority for the notion that a landowner's duty of care can be delegated to an

unnamed third-party to a contract.[17]  Indeed, the government's articulation of the alleged chain of

delegation does not even include a clear reference to its landowner duty of care.  The government

asserts in its motion that there are "several layers of delegation by the United States of America to

other non-governmental entities to assume responsibility for ensuring the safety of the Easter Egg

---

[17] Also unavailing is any suggestion by the government that it delegated its landowner duty of care by virtue of it
being a third-party beneficiary to the subsequent sub-contract between WHHA and Harbinger.  Although the
government is named as a third-party beneficiary to that contract, *see* ECF No. 66-5 at 7, and while third-party
beneficiaries have rights to enforce contracts in the District of Columbia, *see Hossain v. JMU Props., LLC*, 147 A.3d
816, 820 (D.C. 2016), this does not mean that a third-party beneficiary is able, by action of the contract, to delegate
its own landowner duty of care to a party to the contract when that duty is nowhere mentioned in the contract.
Certainly, such a tacit, roundabout strategem would not meet *Seckinger*'s requirement that such delegations "appear
with clarity from the face of the contract."  397 U.S. at 212.

Roll." ECF No. 66-1 at 18. These layers are (1) "delegat[ion] to the [WHHA] the responsibility to hire an event management company and accept responsibility for damages arising from acts or omissions of its employees or those agents," *id.* at 17–18; (2) Harbinger "enter[ing] into a Service Agreement with the [WHHA] in which it would be 'fully responsible for the management, performance, use and safety of the elements to be provided by it' and indemnify both the [WHHA] and the United States of America for any claims 'arising out of the actions or omissions of such event management company or its directors, officers, employees, subcontractors, and agents,'" *id.* at 18; and (3) Harbinger "subcontract[ing] with CMI to place and secure the wires at issue" and "instruct[ing] CMI to secure all wires," *id.* The only mentions of safety here are in the alleged second and third layers of purported delegation, which are by their terms limited in scope to the "elements provided by" Harbinger, ECF No. 66-4 at 11, and the wires, ECF No. 66-1 at 18, respectively. None of this language demonstrates that other entities "assume[d] responsibility for ensuring the safety of the Easter Egg Roll" as a whole or assumed the government's landowner duty of care for the entirety of the White House grounds on that day. ECF No. 66-1 at 18.

Conversely, the responsibilities of the NPS as outlined in the Sponsorship Agreement indicate that the government either intended to retain, or understood that it retained, at least *some* responsibility for the safety of its premises. That contract provides that the NPS was to perform emergency services, such as first aid, as well as public health inspections at the Easter Egg Roll. ECF No. 66-4 at 2–3. Each of these responsibilities is intrinsically connected with safety, which suggests that the government believed it had some role to play in maintaining the safety of its premises, generally. Further, NPS explicitly reserved the right to perform safety inspections of the work of the contractors. *Id.* at 12. This serves as further indication that the government did not intend to fully delegate its landowner duty of care. The Sponsorship Agreement also expressly

provides that the contractor is not to "[i]ndemnify, save and hold harmless and defend" the government for *its own negligence*.  ECF No. 66-4 at 11.  This provides still further evidence, if any is needed, that the government still owed at least some duty of care on the day of the Easter Egg Roll.

Lastly, valid delegations of landowner duty to third parties usually contain some signal that the contractor is assuming responsibility for the safety of the premises, either in full or in part, typically by including a reference to a physical space for which the contractor will be responsible. *See, e.g.*, *Gray*, 2022 WL 3758577, at *2 (finding a valid delegation of landowner duty as to the guard booths of a government-owned building where a contract made it "abundantly clear that [the contractor] was delegated the duty to maintain and repair the metal floor coverings"); *Wright*, 1996 WL 636439, at *3 (finding a valid delegation of landowner duty where the "clear and undisputed language of the contract . . . delegated to [the contractor] the duty to maintain the stairs" on which the plaintiff was injured); *Berkman*, 957 F.2d at 114 (finding that the government had delegated relevant landowner duty as to the floors of the premises, but not the doors of the premises).  This aligns with the fact that landowner duty is, of course, intrinsically tied to the land itself.  *See Brown*, 717 A.2d at 315 n.9.  Here, the government cannot point to a specific area for which WHHA, Harbinger, or CMI were made solely responsible.  Under the Service Agreement, Harbinger was to "[b]e fully responsible for the management, performance, use and safety *of the elements to be provided by it*."  ECF No. 66-4 at 11 (emphasis added).  This provision says nothing of any area of the premises for which Harbinger was to be generally responsible, just that Harbinger was responsible for any objects that it brings onto the premises in connection with the Easter Egg Roll. The closest the contract comes to establishing a specific responsibility for a part of the premises is a provision stating that Harbinger must provide "adequate overnight security between the hours of

6:00 p.m. and 7:00 a.m. for tents, tables and chairs, generators, and any other equipment placed on the Ellipse starting the day that such equipment arrives and for the duration of time such equipment remains on the Ellipse." *Id.* at 6. This language, though, does not help the government because Plaintiff's fall occurred on the South Lawn—not the Ellipse. *See* ECF No. 68-6 at 3.

Again, "if the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intention of the parties to this effect should appear with clarity from the face of the contract."[18] *Seckinger*, 397 U.S. at 212. Here, while the language of the Sponsorship and Service Agreements may indicate that Harbinger owed Plaintiff some legal duties, it does not clearly and unambiguously demonstrate that the government owed her none. The government may have intended to delegate its landowner duty of care on the day of the Easter Egg Roll so that it could avoid liability for this exact type of accident. But this is not clear from the contract the government signed, or the language of the Service Agreement, and this Court will not read into it those documents a delegation of the duty of care imposed by the common law onto all landowners—including the government under the FTCA. *See Nelson*, 838 F.2d at 1285. Accordingly, the government's motion to dismiss for lack of jurisdiction is denied.

## B. There is a Genuine Dispute of Material Fact as to Whether the Government Had Constructive Notice of the Dangerous Condition that Caused Plaintiff's Injury.

"Under the well-settled law of negligence in the District of Columbia, to recover against an owner or occupier of land, a plaintiff is required to show that the defendant had notice—either actual or constructive—of the present existence of an allegedly dangerous condition." *Croce v.*

---

[18] The parties argue extensively in their briefing the impact of this Court's holding in *Hale v. United States* on the instant case. No. 13-cv-1390, 2015 WL 7760161 (D.D.C. Dec. 2, 2015). This Court finds *Hale* distinguishable in that there only minimal discovery had been completed at the time of that decision—a factor that weighed heavily in the Court's decision to deny the motion. *See id.* at *6. In the instant case, however, the parties have had the benefit of full discovery and the opportunity to present their best jurisdictional arguments to the Court. Thus, the rationale in *Hale* is not particularly applicable here.

*Hall*, 657 A.2d 307, 311 (D.C. 1995). Plaintiff concedes that the government did not have actual notice of the unsecured wires, proceeding solely on a theory of constructive notice. *See* ECF No. 68-1 at 22. To demonstrate that the government had constructive notice, Plaintiff must present evidence showing "(1) that a dangerous condition existed . . . and (2) that the dangerous condition existed for such a duration of time that [the government] would have been aware of it if [the government] had exercised reasonable care." *McKenney v. Washington Metro. Area Transit Auth.*, 318 A.3d 559, 564 (D.C. 2024) (ellipses in original) (quoting *Lynn v. District of Columbia,* 734 A.2d 168, 171 (D.C. 1999)). The question of "constructive notice is peculiarly within the province of the [factfinder]" unless there is such a dearth of evidence as to the issue that the factfinder would have to "engage in 'idle speculation'" to make a determination. *Sullivan v. AboveNet Commc'ns, Inc.*, 112 A.3d 347, 357 (D.C. 2015) (quoting *Marinopoliski v. Irish*, 445 A.2d 339, 341 (D.C. 1982)). That is, to defeat the government's motion for summary judgment on this issue, Plaintiff must point to evidence allowing a factfinder to determine that the wires on which Plaintiff tripped and fell were unsecured for a sufficient length of time that the government can be deemed to have had notice of the hazard had it exercised reasonable care.

In its opening brief, the government acknowledges that "[a] defendant is charged with constructive notice 'when or if the danger is . . . notorious or . . . long-continued.'" ECF No. 66-1 at 22 (ellipses in original) (quoting *Smith v. District of Columbia*, 189 F.2d 671, 674 (D.C. Cir. 1951)). It contends that "the evidence in the record supports only the inference that the wires were secured," asserting that CMI's representative testified that the company "secur[ed] the wires the day before the event," that Harbinger "testified to conducting regular walk-throughs to look for potential hazards," that neither Plaintiff nor Braswell "offered testimony establishing that the wire

was unsecured before the fall," and that "there is no evidence demonstrating for how long the wires were unsecured, or what precise portions of the wire were [allegedly] unsecured."[19]  *Id.* at 22–23.

The government mischaracterizes the evidence in the record.  In support of its assertion that CMI secured the wires the day before the event, the government cites testimony that states only that CMI had a "policy" to "either cover or tape down whatever cable is potentially a trip hazard."  ECF No. 66-10 at 2–3.  And it ignores the testimony of CMI project manager Hart that the wiring at issue was placed across the pathway by 10:00 a.m. the day of the event (so it could not have been secured the day before the event), *see* ECF No. 68-8 at 2–3; the testimony of Braswell, corroborated by photographs, that about 30 minutes after Plaintiff's fall, approximately a foot of wiring at the site she believed Plaintiff to have tripped was exposed on the path, *see* ECF No. 66-7 at 4, 6; ECF No. 68-7 at 3; and, most importantly, the government's admissions that the wires on which Plaintiff tripped "were not taped down until after the fall," courtesy of Braswell and Davis,[20] ECF No. 68-9 at 3; *see also* note 3, *supra*.  That is, there is sufficient evidence for a factfinder to determine that the wiring on which Plaintiff alleges she tripped (and on which the government has admitted she tripped), which was located near the edge of a well-traveled pathway, *see* ECF No. 66-6 at 5, was not taped down from—at the latest—10:00 a.m. on April 22, 2019, until (and after) the accident occurred at approximately 3:30 p.m. that same day.  And those facts,

---

[19] The government begins its discussion of the evidence with the assertion that "[t]here is a lack of evidence that demonstrates conclusively whether the wires were in fact unsecured prior to Plaintiff's accident."  ECF No. 66-1 at 22.  Of course, it is not necessary for a plaintiff to "demonstrate[] conclusively" the facts of her case in order to survive a motion for summary judgment; rather, it is the movant who must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

[20] The admission that Braswell and Davis taped down the wires after Plaintiff's fall is important because it confirms—at least on the record currently before the Court—that the wires that CMI laid before 10:00 a.m. the day of the event were the wires Plaintiff tripped on.  Braswell testified at her deposition that she or Davis took photographs of the "foot or foot and a half" of exposed wires they believed to be the cause of Plaintiff's fall, ECF No. 68-7 at 2—those photos were "plaintiff Bates stamped 909 and 910," ECF No. 66-7 at 2.  Those were also the wires they taped down.  ECF No. 68-7 at 2–3.  Hart was shown those same photos and testified that CMI laid the fiber optic cable shown therein by 10:00 a.m. on the day of the event.  ECF No. 68-8 at 2–3.  Incidentally, it appears that those photos are reproduced in Plaintiff's opposition brief.  *See* ECF No. 68-1 at 7–8.

if found, would be sufficient for a factfinder to determine that the government had constructive notice of the defect. *See, e.g.*, *Falco v. Washington Metro. Area Transit Auth.*, No. 18-cv-2766, 2020 WL 473887, at *4 (D.D.C. Jan. 29, 2020) (finding evidence that a hazard "existed from the beginning of the day until around 4 p.m., when Plaintiff sustained her injury" pointed to the conclusion that the defendant had constructive notice of the dangerous condition); *cf., e.g.*, *Hines v. Safeway Stores, Inc.*, 379 A.2d 1174, 1176 n.4 (D.C. 1978) (collecting cases in which the existence of a dangerous condition in a well-traveled public place—specifically, a foreign object on the floor of a market—lasting for as little as three to five minutes presented a question for the factfinder on the issue of constructive notice).

The government's argument in its reply brief does not alter that conclusion. Defendant changes its tune somewhat about the evidence, asserting that it "establishes only that some wires were placed on the morning of the Easter Egg Roll, a few hours before the event began, and that the wires over which Plaintiff allegedly tripped were taped down to the asphalt path after the event." ECF No. 72 at 7. But that, again, is not quite accurate. Hart did not testify merely that "some wires were placed on the morning of the Easter Egg Roll," ECF No. 72 at 7, but that the specific wiring at issue was placed across the path by 10:00 a.m. the day of the event, *see* ECF No. No. 68-8 at 2–3; *see also* note 20, *supra*. And the evidence does not show merely that "the wires over which Plaintiff allegedly tripped were taped down to the asphalt path after the event." ECF No. 72 at 7. Rather, the government's admission establishes conclusively that "the wires on which Nancy Norton fell"—not "allegedly" tripped or fell—"were not taped down until after the [f]all" and that they were taped down by Braswell and Davis. ECF No. 68-9 at 3. As discussed above,

the evidence is sufficient for a factfinder to determine that the government had constructive notice of the hazard at issue.

As such, the government's discussion of *Washington Metropolitan Area Transit Authority v. Jeanty*, 718 A.2d 172 (D.C. 1998), on which Plaintiff relies on her opposition, *see* ECF No. 68-1 at 23, is not helpful.  In *Jeanty*, the court recognized that a common carrier's "failure to comply with its [maintenance] procedures" is some evidence of negligence.  *Id.* at 177–78.  On the issue of constructive notice, the court noted that the plaintiff had "no conclusive proof" that the defective condition existed prior to the accident, as there might have been if the defendant had adhered to its maintenance schedule.  *Id.* at 178.  It did not allow the defendant to benefit from that lack of proof, reasoning that, "[h]aving negligently failed to inspect, WMATA cannot now claim victory upon the ground that the plaintiff was unable to establish facts which the missed inspections might well have revealed."  *Id.*  That is, the point of *Jeanty* is that a defendant cannot be exculpated because its negligence led to a lack of evidence for the plaintiff.  *See Wilson v. Washington Metropolitan Area Transit Authority*, 912 A.2d 1186, 1190–91 (D.C. 2006) (recognizing, in a case in which the plaintiff "did not present any evidence with respect to the duration of time the alleged hazard existed," that, had the plaintiff established the defendant's failure to adhere to its policy regarding inspections, she might have been able to take advantage of "the proposition from *Jeanty*[] that failure to inspect can show constructive notice").  But that is not the case here.  As noted, Plaintiff has evidence that the wires were unsecured from 10:00 a.m. to around 3:30 p.m. She therefore does not have to rely on evidence that the government failed to adhere to a schedule of inspection to create an issue of fact as to constructive notice.  As such, the government's contention that "Plaintiff's failure to adduce evidence establishing that the United States had

established a maintenance schedule that it failed to meet is fatal to Plaintiff's constructive notice claims," ECF No. 72 at 7, fails.[21]

In sum, there is sufficient evidence from which a factfinder could reasonably find that the government had constructive notice of the unsecured wires.

### C.    Plaintiff's Damages are Capped at the Amount Claimed in the Initial SF-95 She Filed with NPS.

Before suing in federal court under the FTCA, a plaintiff must give notice to the agency of her claim and "work through [the] agency's administrative claims process." *Yarullina v. United States*, 770 F. Supp. 3d 205, 211 (D.D.C. 2025). To satisfy the notice requirement, "the claimant must 'file (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum-certain damages claim.'" *Id.* at 212 (quoting *GAF Corp.*, 818 F.2d at 919). The plaintiff in an FTCA action in federal court may not seek more in damages than she sought in the administrative process, except in two situations: (1) "where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency" or (2) "where the increased amount is based . . . upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b).

As noted, Plaintiff's original Standard Form 95, which was sent to the government on August 6, 2019, and provided to NPS (the "appropriate Federal agency," *see* 28 U.S.C. § 2401(b)) on July 13, 2020, sought $1 million in damages. *See* ECF No. 45-2 at 1–2; ECF No. 45-3. That was also the amount Plaintiff claimed when she filed her complaint on March 19, 2021. *See* ECF No. 1 at 8. Then, almost three years later, on March 14, 2024, Plaintiff filed a motion to amend her complaint to claim damages of $3.5 million, citing information she allegedly received in July

---

[21] To the extent that the government means to argue that a plaintiff seeking to prove that a defendant had constructive notice of a hazard *must* show that the defendant failed to adhere to an established maintenance schedule, that is not the law in this jurisdiction, nor can such a rule be derived from *Jeanty* or *Wilson*.

2020 from Dr. Marion that she would not be able to return to her work as a podiatrist and the report of her "vocational and economic expert" Joseph Crouse, Ph.D., assessing her lifetime lost earnings at over $1.8 million. *See* ECF No. 45-1 at 3. The government did not oppose the motion to amend, but reserved the right to challenge the amount of claimed damages if evidence showed that the amendment did not fall into either of the exceptions in 28 U.S.C. § 2675(b). *See* ECF No. 49 at 1. On that basis, the Court granted Plaintiff's motion. *See* ECF No. 50. The government now argues that Plaintiff should be held to her claim of $1 million in damages because she has not showed that the increased amount is based on newly discovered evidence not reasonably discoverable at the time she presented her claim or on intervening facts.[22] *See* ECF No. 66-1 at 23–25.

Plaintiff makes a single argument in her opposition: that Defendant forfeited its opportunity to challenge her increased demand by failing to oppose her motion to amend. *See* ECF No. 68-1 at 24–26. The Court will spend little time on that contention. The government gave notice in its response to Plaintiff's motion to amend that it reserved its right to challenge the increased demand if evidence showed that the requirements of 28 U.S.C. 2675(b) were not met. *See* ECF No. 49 at 1. The Court noted the reservation of rights in its order granting the motion to amend. *See* ECF No. 50 at 1–2. At the time of that reservation of rights, discovery was ongoing—indeed, Plaintiff noted in her motion that neither she "nor any of [her] experts [had yet] been deposed." ECF No. 45-1 at 5. The government now maintains that the evidence fails to support an argument that the increased demand is proper under the statute. That is, the government made clear that its position on Plaintiff's increased demand depended on what the evidence showed. With the benefit of full

---

[22] Plaintiff does not argue that her amended Standard Form 95 of January 8, 2024, which claimed damages of $3.5 million, *see* ECF No. 45-5, should govern the demand here, perhaps because such an argument would be futile. The governing regulations allow an administrative claim "to be amended at any time prior to final agency action or prior to the exercise of the claimant's option under 28 U.S.C. 2675(a)" to file an action in federal court. 28 C.F.R. § 14.2(c). Plaintiff's attempted amendment came well after Plaintiff had filed this action.

discovery, it now takes the position that the evidence does not support Plaintiff's increased demand.  The Court sees nothing improper about that.  Ultimately, whether to deem an argument forfeited is within the discretion of the court.  *See, e.g.*, *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 499 (D.C. Cir. 2015).  The Court will not exercise that discretion in these circumstances.

Plaintiff has a fallback position.  She asks the Court to refer to her argument in the motion to amend "as opposition to the United States' present argument that her damages are capped by her original Form 95."  ECF No. 68-1 at 26.  Although "[i]ncorporation by reference is disfavored," *Robb v. Rollins*, No. 21-cv-2056, 2025 WL 1580849, at *5 n.8 (D.D.C. June 4, 2025), the Court will look to that other filing for Plaintiff's position.

The text of Section 2675(b) makes clear that there are two separate exceptions to the rule that a plaintiff is limited to claiming damages in an amount no greater than that demanded in her administrative claim:

> Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, *except where* the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, *or* upon allegation and proof of intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675(b) (emphasis added).  Courts have interpreted the "newly discovered evidence" exception to apply when the plaintiff relies on "evidence which existed at the time the administrative claim was filed but was 'not discoverable' at that time."  *Lowry v. United States*, 958 F. Supp. 705, 710 (D. Mass. 1997); *see also, e.g.*, *Gallucci v. United States*, No. 22-cv-1692, 2025 WL 2374373, at *4 (D. Or. Aug. 14, 2025) (same); *Pinson v. United States*, No. 19-cv-422, 2023 WL 6148097, at *3 (D. Ariz. Sept. 20, 2023) (same); *Ramone v. U.S. Postal Serv.*, No. 17-cv-825, 2019 WL 3080820, at *4 (E.D. Cal. July 15, 2019) (same).  That comports with the meaning of the phrase "newly discovered evidence" in other contexts.  *See, e.g.*, *Legion Constr.,*

*Inc. v. Gibson*, 310 F.R.D. 1, 3 (D.D.C. 2015) (stating that to prevail on a Fed. R. Civ. P. 60(b)(2)

motion based on newly discovered evidence, the movant must show, among other things, that the

newly discovered evidence existed at the time of trial or other dispositive proceeding and that "the

party seeking relief was justifiably ignorant of the evidence despite due diligence"). "On the other

hand, the term 'intervening facts' denotes things occurring after the filing of the claim." *Lowry*,

958 F. Supp. at 710; *see also, e.g.*, *Gallucci*, 2025 WL 2374373, at *4 (same); *Pinson*, 2023 WL

6148097, at *3 (same); *Ramone*, 2019 WL 3080820, at *4 (same). "The burden is on the [plaintiff]

to prove that either exception is applicable."[23]  *Hoehn v. United States*, 217 F. Supp. 2d 39, 43

(D.D.C. 2002).

Plaintiff's argument on this issue is sparse:

Plaintiff's request to amend the ad damnum plainly falls within the first exception.
At the time she submitted her initial claim in August 2019, Dr. Marion had not yet
determined that Ms. Norton was incapable of returning to work. Additionally, Ms.

---

[23] The procedural posture of this case adds a complication.  The government has filed a motion for summary judgment, the type of motion that is granted where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under that standard, if Plaintiff pointed to an issue of fact as to whether an exception applied, the Court would allow the issue to be resolved by the factfinder at trial.  Here, though, the statute itself puts the onus on the plaintiff to show that one of the exceptions applies:  it bars the "institut[ion]" of any "[a]ction" for a "sum in excess of the amount of the claim presented to the federal agency" except in two situations.  And the description of those exceptions explicitly requires the plaintiff to provide "evidence" or "allegation and proof of intervening facts" to support her request.  28 U.S.C. § 2675(b).  More, some courts, when addressing a plaintiff's request to increase the damages demand above the sum certain in the administrative claim, characterize the issue as jurisdictional, asserting that the court's subject matter jurisdiction extends only as far as the amount presented to the agency unless the plaintiff satisfies one of the exceptions in Section 2675(b).  *See, e.g.*, *Gallucci*, 2025 WL 2374373, at *4  ("Because any damages sought over the sum certain have not been presented to USPS, the Court thus lacks subject matter jurisdiction over those claims."); *La Cien Casas, LLC v. United States*, 18-cv-11, 2020 WL 2111968, at *4 (D. Ariz. May 4, 2020) ("The Court does not have jurisdiction over a claim by Plaintiff for damages above [the amount in his administrative claim].").  Considering that authority, the Court finds that merely creating an issue of fact as to whether intervening facts will allow an increase in Plaintiff's demand is insufficient.  Rather, it is Plaintiff's burden to meet the requirements of the statute to show her entitlement to seek damages in excess of those claimed in her administrative complaint.  *See Lopez v. United States*, No. 19-cv-10946, 2021 WL 9405278, at *2 (C.D. Cal. Jan. 5, 2021) (denying the plaintiff's motion to "exceed the amount of the administrative claim" where there was "an issue of fact whether [her] injuries were reasonably foreseeable at the time the administrative claim was filed"); *Pullen v. United States*, No. 96-cv-1211, 1997 WL 350003, at *6 (D.D.C. June 11, 1997) (similar); *Cf., e.g.*, *Landrum v. United States*, No. 14-cv-5088, 2018 WL 813623, at *1 (D.S.D. Feb. 9, 2018) (requiring the plaintiff to satisfy the "more demanding" standard of 28 U.S.C. s. 2675(b) before determining whether the Plaintiff "satisf[ied] the Federal Rules of Civil Procedure"); *Chang-Williams v. United States*, No. 10-cv-783, 2011 WL 2680714, at *4 (D. Md. July 7, 2011) ("Section 2675(b) . . . imposes its own independent requirements; it would be a mistake to substitute the 'liberal pleading requirements' of Rule 15(a) for the 'narrower' requirement found in the FTCA." (quoting *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 856 (2d Cir. 1984))).

> Norton had not retained a vocational and economics expert (and was under no
> obligation to do so) to assess her lost earnings.  Both Dr. Marion's diagnosis and
> Dr. Crouse's projection of lost earnings amount to "newly discovered evidence not
> reasonably discoverable" at the time Ms. Norton submitted her initial SF95. [24]

ECF No. 45-1 at 5.  Plaintiff makes no attempt, however, to show that the material to which she

points (which, as discussed below, is not really "evidence" as contemplated by Section 2675(b))

existed at the time she filed her administrative claim.  The projection of lost earnings cannot

constitute newly discovered evidence because it was created *after* the date of the administrative

claim.  And Plaintiff does not establish when she received the diagnosis by Dr. Marion that she

"was likely not capable of performing her job as a podiatrist."  ECF No. 45-1 at 2.  To be sure, her

brief in support of her motion to amend asserts that "in August 2019, Dr. Marion had not yet

determined that [Plaintiff] was incapable of returning to work," ECF No. 45-1 at 5, but "counsel's

assertions in briefing . . . are not evidence upon which a court may rely," *Grimes v. District of*

*Columbia*, 794 F.3d 83, 91 n.4 (D.C. Cir. 2015).  She has therefore not shown that she meets the

"newly discovered evidence" exception.

The Court will assume, however, that she meant to contend that "her request to amend the

ad damnum plainly falls within the [second] exception" and that "Dr. Marion's diagnosis and Dr.

Crouse's projection of lost earnings amount to [intervening facts since] Ms. Norton submitted her

initial SF95."  ECF No. 45-1 at 5.  It does not change the analysis significantly.  The second

exception requires "proof of intervening facts."  28 U.S.C. § 2675(b).  As noted above, Plaintiff

has not established with competent evidence when Dr. Marion opined that she would be unable to

---

[24] Plaintiff states that Crouse, her "vocational and economic expert," determined that she "was rendered permanently disabled as a result of the fall and could not resume any gainful employment thereafter—let alone her chosen career as a podiatrist."  ECF No. 45-1 at 3.  It is true that the expert report asserts that she is "100% occupationally disabled from substantial, gainful employment," ECF No. 45-4 at 4, but that appears to be an assumption rather than a conclusion based on evidence.  The statement immediately follows a quotation from Dr. Marion's "medical records and attending physician's statement of disability," which asserts only that Plaintiff is "incapable of doing her previous job," not that she is incapable of performing any job. *Id.*

return to her work. Thus, the only arguable "proof" Plaintiff presents is the report of her vocational and economic expert, which calculates her lifetime loss of earnings as $1,808,996. *See* ECF No. 45-4 at 1. But courts have rejected the notion that an expert report assessing a plaintiff's damages for the purposes of litigation may constitute an intervening fact under the statute. *See Chang-Williams*, 2011 WL 2680714, at *2 n.2 ("[The plaintiff] must show that the new damages rest upon either newly discovered evidence or intervening facts. The proffered expert testimony shows neither. Nor is the expert testimony itself a newly discovered piece of evidence or an intervening fact as contemplated by § 2675(b)."); *see also Elliott v. United States*, No. 21-cv-154, 2022 WL 19376, at *3 (D.N.M. Jan. 3, 2022) ("Consulting an expert, like an attorney, after filing an SF-95 to determine the true value of one's claim does not constitute 'newly discovered' evidence or an 'intervening fact' as contemplated by § 2675(b)."); *Rodriguez v. United States*, No. 17-cv-251S, 2021 WL 5903307, at *5 (W.D.N.Y. Dec. 14, 2021) (rejecting the argument that an economic expert's revised opinion constituted an intervening fact that supported increasing the plaintiff's claimed damages); *Benjamin v. United States*, 85 F. Supp. 2d 1034, 1036 (D. Colo. 2000) (finding documentation that "more accurately quantifie[s]" damages "is not a basis for overriding the ad damnum clause"). Thus, Plaintiff has offered no evidence to support her argument. Nor has she engaged with the evidence the government highlights to oppose Plaintiff's attempt to increase her potential damages, such as the warning prior to her surgery of the risk of nerve damage, physical therapy notes that she was on disability in June 2019 because of pain in her upper extremities, and evidence that she had nerve damage prior to submitting her administrative claim. *See* ECF No. 66-1 at 25.

Finally, she fails to offer a legal argument to counter the government's briefing. Courts utilize different tests to determine if "'intervening facts' warrant application of the exception to

the sum certain requirement": the "worst-case prognosis test, the reasonably discoverable/foreseeable test[,] and the change in expectations test." *Bravo-Garcia v. United States*, No. 13-cv-2185, 2015 WL 224625, at *4 (D.N.J. Jan. 15, 2015). The D.C. Circuit has not spoken decisively on this issue. In *Husovsky v. United States*—a case that Plaintiff cites but fails to discuss—the D.C. Circuit affirmed the trial court's "award of damages to [the plaintiff] in excess of his earlier administrative claim against the United States" under the intervening facts exception where the plaintiff, who had severe and permanent injuries, had a "striking" and "surpris[ing]" increase in his life expectancy that consequently increased his potential damages. 590 F.2d 944, 954 (D.C. Cir. 1978). Without significant discussion, the D.C. Circuit found that the increase in life expectancy "surely constitutes 'an intervening fact, relating to the amount of (his) claim' against the United States." *Id.* at 955 (alteration in original) (quoting 28 U.S.C. § 2675(b)). The Court struggles to discern a generally applicable standard from *Husovsky*.[25]

The government champions the "worst-case prognosis" standard—a standard it notes courts in this District have applied. *See* ECF No. 66-1 at 24 (citing *Tookes v. United States*, 811 F. Supp. 2d 322 (D.D.C. 2011), and *Calva-Cerqueira v. United States*, 281 F. Supp. 2d 279 (D.D.C. 2003)). Under that standard, "[i]f a plaintiff could have reasonably obtained the information on the specific injuries needed to make out the worst-case scenario when he filed the original claim, then new information about the injuries will not qualify as . . . 'intervening facts.'" *Calva-Cerqueira*, 281 F. Supp. 2d at 302 (citing *Dickerson v. United States,* 280 F.3d 470, 476 (5th Cir. 2002)). On the other hand, "'[i]nformation that merely concerns the precision with which

---

[25] Other courts have suggested that *Husovsky* allows a claim to be increased "when the claimant either did not know or reasonably could not have known the severity of the injury at the time the FTCA tort claim notice was filed." *Njos v. Kane*, No. 12-cv-1252, 2015 WL 999398, at *3 (M.D. Pa. Mar. 5, 2015) (citing *Husovsky*, 590 F.2d 944). The Court believes that overreads the D.C. Circuit's meager discussion on the issue.

the nature, extent, or duration of a claimant's condition can be known' fails to surmount the bar created by the FTCA." *Tookes*, 811 F. Supp. 2d at 334 (citation modified) (quoting *Lebron v. United States,* 279 F.3d 321, 330 (5th Cir. 2002)).  Courts have found that "'[r]equiring a plaintiff to guard against a worst-case scenario' in preparing an administrative claim and declaring sum-certain damages is in accordance with the FTCA's purpose of encouraging settlement."  *Id.* (quoting *Lebron*, 279 F.3d at 330–31)).  It would also seem to be consistent with the principle that "strict adherence to FTCA terms, conditions and requirements" is "[m]andated."  *Pullen*, 1997 WL 350003, at *2; *see also, e.g.*, *Torres v. United States*, No. 21-CV-04953, 2022 WL 2115996, at *3 (E.D. Pa. June 13, 2022) ("[T]he limitations in § 2675(b) must be 'strictly observed' . . . ." (quoting *White-Squire v. United States*, 592 F.3d 453, 458 (3d Cir. 2010))).  Plaintiff fails to argue either that a different standard should apply or that she meets the standard the government urges.

These deficiencies—that is, Plaintiff's scanty discussion which fails to address the government's reasoning and is unsupported by evidence—are sufficiently serious for the Court to deem Plaintiff's arguments on this issue forfeited.  *See, e.g.*, *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . .  [A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).

Even if she had not forfeited any argument that she has met her burden under Section 2675(b), she would not be entitled to an increased damages demand under the standard articulated by the government.[26]  Rather, the record before the Court shows that she had sufficient information

---

[26] In the absence of a robust (or, frankly, even an anemic) argument that a different standard should govern, the Court assumes without deciding that the worst-case prognosis standard is appropriate.

when she filed her claim in August 2019 that her worst-case prognosis would be "continue[d] . . . significant weakness in the left hand and arm that [would] prevent her" from working. ECF No. 66-14 at 2.

Again, that evidence includes a treatment note from Plaintiff's surgeon asserting that she was informed prior to her April 2019 surgery that the risks included "nerve damage, chronic pain, stiffness, [and] the need for more surgery."[27] ECF No. 66-12 at 1. The notes from her June 3, 2019, physical therapy initial examination reflect that she was then on temporary total disability; that she had pain in her elbow and pain in both wrists, rendering her unable to put weight on them; that her "clinical presentation [was] evolving with changing characteristics"; and that one of her goals was to be able "to return to the full duties of her job as a podiatrist" in eight weeks. ECF No. 66-13 at 1–2. Plaintiff testified at her deposition that the physical therapy did not improve her condition. ECF No. 68-6 at 6. That is, she knew by the end of July 2019 that she had not improved to the point that she could return to work; indeed, her condition was no better. Imaging in August 2019, the month she filed her administrative claim, showed nerve damage. *See* ECF No. 66-14 at 1. And she knew well before then that nerve damage had caused atrophy to her left hand. Plaintiff signed her first SF-95 on July 3, 2019 (as noted, it was not submitted until August 6, 2019), describing her injury as a fracture causing "ulnar nerve damage" that led to "atrophy to the left hand."[28] ECF No. 45-2 at 2. That is, by the time she filed her administrative claim, Plaintiff had been on disability for weeks and knew she had nerve damage and atrophy to her left hand, unimproved by physical therapy, that made her previous work impossible. At that point she had

---

[27] Plaintiff testified at her deposition that she was not warned by her surgeon about potential nerve damage, which is contradicted by medical evidence in the record. *See* ECF No. 68-6 at 6 (Plaintiff's testimony); ECF No. 66-12 (medical record from the surgery). Even crediting Plaintiff's testimony, however, she knew she had nerve damage prior to submission of her administrative claim, as discussed below.

[28] Her later SF-95, from January 2024, relies on the exact same language as the basis for an increased demand of $3.5 million. *See* ECF No. 45-5 at 2.

sufficient information to determine that her worst-case prognosis was continued, permanent disability. More, statements of Dr. Marion that she would no longer be able to work as a podiatrist "concern[] [merely] the precision with which the nature, extent, or duration" of her condition was known, which "fails to surmount the bar created by [Section 2675(b)]." *Tookes*, 811 F. Supp. 2d at 334 (quoting *Lebron,* 279 F.3d at 330). Because on the record before the Court, Plaintiff could not meet the standard the government puts forth, Plaintiff's damages must be capped the amount sought in her initial SF-95. *See, e.g.*, *Lopez*, 2021 WL 9405278, at *2 (denying a motion to exceed the amount of damages demanded in an administrative claim where there was "an issue of fact whether" the plaintiff met the requirements of Section 2675(b)); *Pullen*, 1997 WL 350003, at *6 (similar).

In sum, by failing to marshal evidence in support and failing to address the government's contentions in opposition, Plaintiff has forfeited any argument that she is entitled to seek increased damages. More, the record before the Court does not show that she could meet her burden under Section 2675(b) to seek damages in an amount greater than the $1 million she sought in her administrative claim.

## IV.    CONCLUSION

For the foregoing reasons, the government's motion, ECF No. 66, is **GRANTED IN PART AND DENIED IN PART**. Specifically, it is denied to the extent that it seeks dismissal on the basis that this Court lacks subject-matter jurisdiction over the action and to the extent that it

seeks summary judgment in its favor on Plaintiff's negligence claim; it is granted to the extent it seeks to limit Plaintiff's potential damages to $1 million.

**SO ORDERED.**

Date: October 22, 2025

_____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE